ARIZONA *v.* CALIFORNIA ET AL.

No. 8, Original.   Argued January 8–11, 1962.—Restored to calendar
for reargument June 4, 1962.—Reargued November 13–14,
1962.—Decided June 3, 1963.

548

*Mark Wilmer* reargued the cause for complainant. With him on the briefs were *Chas. H. Reed, William R. Meagher, Burr Sutter, John E. Madden, Calvin H. Udall, John Geoffrey Will, W. H. Roberts* and *Theodore Kiendl.*

*Northcutt Ely,* Special Assistant Attorney General of California, reargued the cause for the State of California et al., defendants. With him on the briefs were *Stanley Mosk,* Attorney General, *Charles E. Corker* and *Gilbert*

F. Nelson, Assistant Attorneys General, *Burton J. Gindler, John R. Alexander* and *Gerald Malkan,* Deputy Attorneys General, *Shirley M. Hufstedler, Howard I. Friedman, C. Emerson Duncan II, Jerome C. Muys, Francis E. Jenney, Stanley C. Lagerlof, Roy H. Mann, Harry W. Horton, R. L. Knox, Jr., Earl Redwine, James H. Howard, Charles C. Cooper, Jr., H. Kenneth Hutchinson, Frank P. Doherty, Roger Arnebergh, Gilmore Tillman, Alan M. Firestone, Jean F. DuPaul* and *Henry A. Dietz.*

*Solicitor General Cox* reargued the cause for the United States, intervener. With him on the briefs were *John F. Davis, David R. Warner, Walter Kiechel, Jr.* and *Warren R. Wise.*

*R. P. Parry* reargued the cause for the State of Nevada, intervener. With him on the briefs were *Roger D. Foley,* Attorney General, *W. T. Mathews* and *Clifford E. Fix.*

*Walter L. Budge,* Attorney General of Utah, and *Dennis McCarthy,* Special Assistant Attorney General, filed a statement on behalf of the State of Utah.

*Earl E. Hartley,* Attorney General of New Mexico, *Thomas O. Olson,* First Assistant Attorney General, and *Claude S. Mann* and *Dudley Cornell,* Special Assistant Attorneys General, filed a brief for the State of New Mexico.

MR. JUSTICE BLACK delivered the opinion of the Court.

In 1952 the State of Arizona invoked the original jurisdiction of this Court [1] by filing a complaint against the

---

[1] "The judicial Power shall extend . . . to Controversies between two or more States : . . .

"In all Cases . . . in which a State shall be Party, the supreme Court shall have original Jurisdiction." U. S. Const., Art. III, § 2. See also 28 U. S. C. § 1251 (a) (1).

Three times previously Arizona has instituted actions in this Court concerning the Colorado River. *Arizona v. California,* 283 U. S. 423

State of California and seven of its public agencies.[2] Later, Nevada, New Mexico, Utah, and the United States were added as parties either voluntarily or on motion.[3] The basic controversy in the case is over how much water each State has a legal right to use out of the waters of the Colorado River and its tributaries. After preliminary pleadings, we referred the case to George I. Haight, Esquire, and upon his death in 1955 to Simon H. Rifkind, Esquire, as Special Master to take evidence, find facts, state conclusions of law, and recommend a decree, all "subject to consideration, revision, or approval by the Court."[4] The Master conducted a trial lasting from June 14, 1956, to August 28, 1958, during which 340 witnesses were heard orally or by deposition, thousands of exhibits were received, and 25,000 pages of transcript were filled. Following many motions, arguments, and briefs, the Master in a 433-page volume reported his findings, conclusions, and recommended decree, received by the Court on January 16, 1961.[5] The case has been extensively briefed here and orally argued twice, the first time about 16 hours, the second, over six. As we see this case, the question of each State's share of the waters of the Colorado and its tributaries turns on the meaning and the scope of the Boulder Canyon Project Act passed by Congress in

---

(1931); *Arizona v. California,* 292 U. S. 341 (1934); *Arizona v. California,* 298 U. S. 558 (1936). See also *United States v. Arizona,* 295 U. S. 174 (1935).

[2] Palo Verde Irrigation District, Imperial Irrigation District, Coachella Valley County Water District, Metropolitan Water District of Southern California, City of Los Angeles, City of San Diego, and County of San Diego.

[3] 344 U. S. 919 (1953) (intervention by United States); 347 U. S. 985 (1954) (intervention by Nevada); 350 U. S. 114 (1955) (joinder of Utah and New Mexico).

[4] The two orders are reported at 347 U. S. 986 (1954), and 350 U. S. 812 (1955).

[5] 364 U. S. 940 (1961).

1928.[6] That meaning and scope can be better understood when the Act is set against its background—the gravity of the Southwest's water problems; the inability of local groups or individual States to deal with these enormous problems; the continued failure of the States to agree on how to conserve and divide the waters; and the ultimate action by Congress at the request of the States creating a great system of dams and public works nationally built, controlled, and operated for the purpose of conserving and distributing the water.

The Colorado River itself rises in the mountains of Colorado and flows generally in a southwesterly direction for about 1,300 miles through Colorado, Utah, and Arizona and along the Arizona-Nevada and Arizona-California boundaries, after which it passes into Mexico and empties into the Mexican waters of the Gulf of California. On its way to the sea it receives tributary waters from Wyoming, Colorado, Utah, Nevada, New Mexico, and Arizona. The river and its tributaries flow in a natural basin almost surrounded by large mountain ranges and drain 242,000 square miles, an area about 900 miles long from north to south and 300 to 500 miles wide from east to west—practically one-twelfth the area of the continental United States excluding Alaska. Much of this large basin is so arid that it is, as it always has been, largely dependent upon managed use of the waters of the Colorado River System to make it productive and inhabitable. The Master refers to archaeological evidence that as long as 2,000 years ago the ancient Hohokam tribe built and maintained irrigation canals near what is now Phoenix, Arizona, and that American Indians were practicing irrigation in that region at the time white men first explored it. In the second half of the nineteenth century a group

---

[6] Boulder Canyon Project Act, 45 Stat. 1057 (1928), 43 U. S. C. §§ 617–617t.

of people interested in California's Imperial Valley conceived plans to divert water from the mainstream of the Colorado to give life and growth to the parched and barren soil of that valley. As the most feasible route was through Mexico, a Mexican corporation was formed and a canal dug partly in Mexico and partly in the United States. Difficulties which arose because the canal was subject to the sovereignty of both countries generated hopes in this country that some day there would be a canal wholly within the United States, an all-American canal.[7]

During the latter part of the nineteenth and the first part of the twentieth centuries, people in the Southwest continued to seek new ways to satisfy their water needs, which by that time were increasing rapidly as new settlers moved into this fast-developing region. But none of the more or less primitive diversions made from the mainstream of the Colorado conserved enough water to meet the growing needs of the basin. The natural flow of the Colorado was too erratic, the river at many places in canyons too deep, and the engineering and economic hurdles too great for small farmers, larger groups, or even States to build storage dams, construct canals, and install the expensive works necessary for a dependable year-round water supply. Nor were droughts the basin's only problem; spring floods due to melting snows and seasonal storms were a recurring menace, especially disastrous in California's Imperial Valley where, even after the Mexican canal provided a more dependable water supply, the threat of flood remained at least as serious as before. Another troublesome problem was the erosion of land and the deposit of silt which fouled waters, choked irrigation works, and damaged good farmland and crops.

---

[7] "[The All-American Canal] will end an intolerable situation, under which the Imperial Valley now secures its sole water supply from a canal running for many miles through Mexico . . . ." S. Rep. No. 592, 70th Cong., 1st Sess. 8 (1928).

554

It is not surprising that the pressing necessity to trans-
form the erratic and often destructive flow of the Colorado
River into a controlled and dependable water supply
desperately needed in so many States began to be talked
about and recognized as far more than a purely local
problem which could be solved on a farmer-by-farmer,
group-by-group, or even state-by-state basis, desirable
as this kind of solution might have been. The inade-
quacy of a local solution was recognized in the Report
of the All-American Canal Board of the United States
Department of the Interior on July 22, 1919, which de-
tailed the widespread benefits that could be expected from
construction by the United States of a large reservoir on
the mainstream of the Colorado and an all-American
canal to the Imperial Valley.[8]  Some months later, May
18, 1920, Congress passed a bill offered by Congressman
Kinkaid of Nebraska directing the Secretary of the
Interior to make a study and report of diversions which
might be made from the Colorado River for irrigation
in the Imperial Valley.[9]  The Fall-Davis Report,[10] sub-
mitted to Congress in compliance with the Kinkaid Act,
began by declaring, "The control of the floods and
development of the resources of the Colorado River are
peculiarly national problems . . ."[11] and then went on
to give reasons why this was so, concluding with the state-
ment that the job was so big that only the Federal Gov-
ernment could do it.[12]  Quite naturally, therefore, the

[8] Department of the Interior, Report of the All-American Canal
Board (1919), 23–33. The three members of the Board were engineers
with long experience in Western water problems.

[9] 41 Stat. 600 (1920).

[10] S. Doc. No. 142, 67th Cong., 2d Sess. (1922).

[11] Id., at 1.

[12] The reasons given were:

"1. The Colorado River is international.

"2. The stream and many of its tributaries are interstate.

Report recommended that the United States construct as a government project not only an all-American canal from the Colorado River to the Imperial Valley but also a dam and reservoir at or near Boulder Canyon.[13]

The prospect that the United States would undertake to build as a national project the necessary works to control floods and store river waters for irrigation was apparently a welcome one for the basin States. But it brought to life strong fears in the northern basin States that additional waters made available by the storage and canal projects might be gobbled up in perpetuity by faster growing lower basin areas, particularly California, before the upper States could appropriate what they believed to be their fair share. These fears were not without foundation, since the law of prior appropriation prevailed in most of the Western States.[14] Under that law the one who first appropriates water and puts it to beneficial use thereby acquires a vested right to continue to divert and use that quantity of water against all claimants junior to him in point of time.[15] "First in time, first in right" is the shorthand expression of this legal principle. In 1922, only four months after the Fall-Davis Report, this Court in Wyoming v. Colorado, 259 U. S. 419, held that the

"3. It is a navigable river.

"4. Its waters may be made to serve large areas of public lands naturally desert in character.

"5. Its problems are of such magnitude as to be beyond the reach of other than national solution." Ibid.

[13] Id., at 21.

[14] This law prevails exclusively in all the basin States except California. See I Wiel, Water Rights in the Western States § 66 (3d ed., 1911); Hutchins, Selected Problems in the Law of Water Rights in the West 30–31 (1942) (U. S. Dept. of Agriculture Misc. Pub. No. 418). Even in California it is important. See 51 Cal. Jur. 2d Waters §§ 257–264 (1959).

[15] Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U. S. 92, 98 (1938); Arizona v. California, 283 U. S. 423, 459 (1931).

doctrine of prior appropriation could be given interstate effect.[16]   This decision intensified fears of Upper Basin States that they would not get their fair share of Colorado River water.[17]   In view of California's phenomenal growth, the Upper Basin States had particular reason to fear that California, by appropriating and using Colorado River water before the upper States, would, under the interstate application of the prior appropriation doctrine, be "first in time" and therefore "first in right."  Nor were such fears limited to the northernmost States.   Nevada, Utah, and especially Arizona were all apprehensive that California's rapid declaration of appropriative claims would deprive them of their just share of basin water available after construction of the proposed United States project.   It seemed for a time that these fears would keep the States from agreeing on any kind of division of the river waters.   Hoping to prevent "conflicts" and "expensive litigation" which would hold up or prevent the tremendous benefits expected from extensive federal development of the river,[18] the basin States requested and Congress passed an Act on August 19, 1921, giving the

---

[16] The doctrine continues to be applied interstate.   *E. g., Nebraska v. Wyoming,* 325 U. S. 589, 617–618 (1945).

[17] "Delph E. Carpenter, Colorado River Commissioner for the State of Colorado, summarized the situation produced by that decision as follows:

" 'The upper state has but one alternative, that of using every means to retard development in the lower state until the uses within the upper state have reached their maximum.   The states may avoid this unfortunate situation by determining their respective rights by interstate compact before further development in either state, thus permitting freedom of development in the lower state without injury to future growth in the upper.'

"The final negotiation of the compact took place in the atmosphere produced by that decision."   H. R. Doc. No. 717, 80th Cong., 2d Sess. 22 (1948).

[18] H. R. Rep. No. 191, 67th Cong., 1st Sess. (1921).

States consent to negotiate and enter into a compact for the "equitable division and apportionment . . . of the water supply of the Colorado River." [19]

. Pursuant to this congressional authority, the seven States appointed Commissioners who, after negotiating for the better part of a year, reached an agreement at Santa Fe, New Mexico, on November 24, 1922. The agreement, known as the Colorado River Compact,[20] failed to fulfill the hope of Congress that the States would themselves agree on each State's share of the water. The most the Commissioners were able to accomplish in the Compact was to adopt a compromise suggestion of Secretary of Commerce Herbert Hoover, specially designated as United States representative.[21] This compromise divides the entire basin into two parts, the Upper Basin and the Lower Basin, separated at a point on the river in northern Arizona known as Lee Ferry. (A map showing the two basins and other points of interest in this controversy is printed as an Appendix facing p. 602.) Article III (a) of the Compact apportions to each basin in perpetuity 7,500,000 acre-feet of water [22] a year from the Colorado River System, defined in Article II (a) as "the Colorado River and its tributaries within the United States of America." In addition, Article III (b) gives the Lower Basin "the right to increase its beneficial consumptive use [23] of such waters by one million acre-feet per annum." Article III (c) provides that future Mex-

---

[19] 42 Stat. 171 (1921).

[20] The Compact can be found at 70 Cong. Rec. 324 (1928), and U. S. Dept. of the Interior, Documents on the Use and Control of the Waters of Interstate and International Streams 39 (1956).

[21] H. R. Doc. No. 717, 80th Cong., 2d Sess. 22 (1948).

[22] An acre-foot of water is enough to cover an acre of land with one foot of water.

[23] "Beneficial consumptive use" means consumptive use measured by diversions less return flows, for a beneficial (nonwasteful) purpose.

558

ican water rights recognized by the United States shall be supplied first out of surplus over and above the aggregate of the quantities specified in (a) and (b), and if this surplus is not enough the deficiency shall be borne equally by the two basins. Article III (d) requires the Upper Basin not to deplete the Lee Ferry flow below an aggregate of 75,000,000 acre-feet for any 10 consecutive years. Article III (f) and (g) provide a way for further apportionment by a compact of "Colorado River System" waters at any time after October 1, 1963. While these allocations quieted rivalries between the Upper and Lower Basins, major differences between the States in the Lower Basin continued. Failure of the Compact to determine each State's share of the water left Nevada and Arizona with their fears that the law of prior appropriation would be not a protection but a menace because California could use that law to get for herself the lion's share of the waters allotted to the Lower Basin. Moreover, Arizona, because of her particularly strong interest in the Gila, intensely resented the Compact's inclusion of the Colorado River tributaries in its allocation scheme and was bitterly hostile to having Arizona tributaries, again particularly the Gila, forced to contribute to the Mexican burden. Largely for these reasons, Arizona alone, of all the States in both basins, refused to ratify the Compact.[24]

Seeking means which would permit ratification by all seven basin States, the Governors of those States met at Denver in 1925 and again in 1927. As a result of these meetings the Governors of the upper States suggested, as a fair apportionment of water among the Lower Basin States, that out of the average annual delivery of water at

[24] Arizona did ratify the Compact in 1944, after it had already become effective by six-state ratification as permitted by the Boulder Canyon Project Act.

Lee Ferry required by the Compact—7,500,000 acre-feet—Nevada be given 300,000 acre-feet, Arizona 3,000,000, and California 4,200,000, and that unapportioned waters, subject to reapportionment after 1963, be shared equally by Arizona and California. Each Lower Basin State would have "the exclusive beneficial consumptive use of such tributaries within its boundaries before the same empty into the main stream," except that Arizona tributary waters in excess of 1,000,000 acre-feet could under some circumstances be subject to diminution by reason of a United States treaty with Mexico. This proposal foundered because California held out for 4,600,000 acre-feet instead of 4,200,000 [25] and because Arizona held out for complete exemption of its tributaries from any part of the Mexican burden. [26]

Between 1922 and 1927 Congressman Philip Swing and Senator Hiram Johnson, both of California, made three attempts to have Swing-Johnson bills enacted, authorizing construction of a dam in the canyon section of the Colorado River and an all-American canal. [27] These bills would have carried out the original Fall-Davis Report's recommendations that the river problem be recognized and treated as national, not local. Arizona's Senators and Congressmen, still insisting upon a definite guaranty of water from the mainstream, bitterly fought these proposals because they failed to provide for exclusive use of her own tributaries, particularly the Gila, and for exemption of these tributaries from the Mexican burden.

---

[25] Hearings on H. R. 5773 before the House Committee on Irrigation and Reclamation, 70th Cong., 1st Sess. 402–405 (1928).

[26] *Id.*, at 30–31. Arizona also objected to the provisions concerning electrical power.

[27] H. R. 11449, 67th Cong., 2d Sess. (1922); H. R. 2903, S. 727, 68th Cong., 1st Sess. (1923); H. R. 9826, S. 3331, 69th Cong., 1st Sess. (1926).

Finally, the fourth Swing-Johnson bill passed both Houses and became the Boulder Canyon Project Act of December 21, 1928, 45 Stat. 1057. The Act authorized the Secretary of the Interior to construct, operate, and maintain a dam and other works in order to control floods, improve navigation, regulate the river's flow, store and distribute waters for reclamation and other beneficial uses, and generate electrical power.[28] The projects authorized by the Act were the same as those provided for in the prior defeated measures, but in other significant respects the Act was strikingly different. The earlier bills had offered no method whatever of apportioning the waters among the States of the Lower Basin. The Act as finally passed did provide such a method, and, as we view it, the method chosen was a complete statutory apportionment intended to put an end to the long-standing dispute over Colorado River waters. To protect the Upper Basin against California should Arizona still refuse to ratify the Compact,[29] § 4 (a) of the Act as finally passed provided that, if fewer than seven States ratified within six months, the Act should not take effect unless six States including California ratified and unless California, by its legislature, agreed "irrevocably and unconditionally . . . as an express covenant" to a limit on its annual consumption of Colorado River water of "four million four hundred thousand acre-feet of the waters apportioned to the lower

---

[28] Another purpose of the Act was to approve the Colorado River Compact, which had allocated the water between the two basins.

[29] The Upper Basin States feared that, if Arizona did not ratify the Compact, the division of water between the Upper and Lower Basins agreed on in the Compact would be nullified. The reasoning was that Arizona's uses would not be charged against the Lower Basin's apportionment and that California would therefore be free to exhaust that apportionment herself. Total Lower Basin uses would then be more than permitted in the Compact, leaving less water for the Upper Basin.

basin States by paragraph (a) of Article III of the Colorado River compact, plus not more than one-half of any excess or surplus waters unapportioned by said compact." Congress in the same section showed its continuing desire to have California, Arizona, and Nevada settle their own differences by authorizing them to make an agreement apportioning to Nevada 300,000 acre-feet, and to Arizona 2,800,000 acre-feet plus half of any surplus waters unapportioned by the Compact. The permitted agreement also was to allow Arizona exclusive use of the Gila River, wholly free from any Mexican obligation, a. position Arizona had taken from the beginning. Sections 5 and 8 (b) of the Project Act made provisions for the sale of the stored waters. The Secretary of the Interior was authorized by § 5 "under such general regulations as he may prescribe, to contract for the storage of water in said reservoir and for the delivery thereof at such points on the river and on said canal as may be agreed upon, for irrigation and domestic uses . . . ." Section 5 required these contracts to be "for permanent service" and further provided, "No person shall have or be entitled to have the use for any purpose of the water stored as aforesaid except by contract made as herein stated." Section 8 (b) provided that the Secretary's contracts would be subject to any compact dividing the benefits of the water between Arizona, California, and Nevada, or any two of them, approved by Congress on or before January 1, 1929, but that any such compact approved after that date should be "subject to all contracts, if any, made by the Secretary of the Interior under section 5 hereof prior to the date of such approval and consent by Congress."

The Project Act became effective on June 25, 1929, by Presidential Proclamation,[30] after six States, including California, had ratified the Colorado River Compact and

[30] 46 Stat. 3000 (1929).

the California legislature had accepted the limitation of 4,400,000 acre-feet [31] as required by the Act. Neither the three States nor any two of them ever entered into any apportionment compact as authorized by §§ 4 (a) and 8 (b). After the construction of Boulder Dam the Secretary of the Interior, purporting to act under the authority of the Project Act, made contracts with various water users in California for 5,362,000 acre-feet, with Nevada for 300,000 acre-feet, and with Arizona for 2,800,000 acre-feet of water from that stored at Lake Mead.

The Special Master appointed by this Court found that the Colorado River Compact, the law of prior appropriation, and the doctrine of equitable apportionment—by which doctrine this Court in the absence of statute resolves interstate claims according to the equities—do not control the issues in this case. The Master concluded that, since the Lower Basin States had failed to make a compact to allocate the waters among themselves as authorized by §§ 4 (a) and 8 (b), the Secretary's contracts with the States had within the statutory scheme of §§ 4 (a), 5, and 8 (b) effected an apportionment of the waters of the mainstream which, according to the Master, were the only waters to be apportioned under the Act. The Master further held that, in the event of a shortage of water making it impossible for the Secretary to supply all the water due California, Arizona, and Nevada under their contracts, the burden of the shortage must be borne by each State in proportion to her share of the first 7,500,000 acre-feet allocated to the Lower Basin, that is, $\frac{4.4}{7.5}$ by California, $\frac{2.8}{7.5}$ by Arizona, and $\frac{.3}{7.5}$ by Nevada, without regard to the law of prior appropriation.

Arizona, Nevada, and the United States support with few exceptions the analysis, conclusions, and recommen-

---

[31] California Limitation Act, Cal. Stat. 1929, c. 16, at 38.

dations of the Special Master's report. These parties agree that Congress did not leave division of the waters to an equitable apportionment by this Court but instead created a comprehensive statutory scheme for the allocation of mainstream waters. Arizona, however, believes that the allocation formula established by the Secretary's contracts was in fact the formula required by the Act. The United States, along with California, thinks the Master should not have invalidated the provisions of the Arizona and Nevada water contracts requiring those States to deduct from their allocations any diversions of water above Lake Mead which reduce the flow into that lake.

California is in basic disagreement with almost all of the Master's Report. She argues that the Project Act, like the Colorado River Compact, deals with the entire Colorado River System, not just the mainstream. This would mean that diversions within Arizona and Nevada of tributary waters flowing in those States would be charged against their apportionments and that, because tributary water would be added to the mainstream water in computing the first 7,500,000 acre-feet available to the States, there would be a greater likelihood of a surplus, of which California gets one-half. The result of California's argument would be much more water for California and much less for Arizona. California also argues that the Act neither allocates the Colorado River waters nor gives the Secretary authority to make an allocation. Rather she takes the position that the judicial doctrine of equitable apportionment giving full interstate effect to the traditional western water law of prior appropriation should determine the rights of the parties to the water. Finally, California claims that in any event the Act does not control in time of shortage. Under such circumstances, she says, this Court should divide the waters according to the doctrine of equitable apportionment or

the law of prior appropriation, either of which, she argues, should result in protecting her prior uses.

Our jurisdiction to entertain this suit is not challenged and could not well be since Art. III, § 2, of the Constitution gives this Court original jurisdiction of actions in which States are parties. In exercising that jurisdiction, we are mindful of this Court's often expressed preference that, where possible, States settle their controversies by "mutual accommodation and agreement." [32] Those cases and others [33] make it clear, however, that this Court does have a serious responsibility to adjudicate cases where there are actual, existing controversies over how interstate streams should be apportioned among States. This case is the most recent phase of a continuing controversy over the water of the Colorado River, which the States despite repeated efforts have been unable to settle. Resolution of this dispute requires a determination of what apportionment, if any, is made by the Project Act and what powers are conferred by the Act upon the Secretary of the Interior. Unless many of the issues presented here are adjudicated, the conflicting claims of the parties will continue, as they do now, to raise serious doubts as to the extent of each State's right to appropriate water from the Colorado River System for existing or new uses. In this situation we should and do exercise our jurisdiction.

## I.

### ALLOCATION OF WATER AMONG THE STATES AND DISTRIBUTION TO USERS.

We have concluded, for reasons to be stated, that Congress in passing the Project Act intended to and did

---

[32] Colorado v. Kansas, 320 U. S. 383, 392 (1943); Nebraska v. Wyoming, 325 U. S. 589, 616 (1945).

[33] E. g., Kansas v. Colorado, 185 U. S. 125 (1902); New Jersey v. New York, 283 U. S. 336 (1931).

create its own comprehensive scheme for the apportionment among California, Arizona, and Nevada of the Lower Basin's share of the mainstream waters of the Colorado River, leaving each State its tributaries. Congress decided that a fair division of the first 7,500,000 acre-feet of such mainstream waters would give 4,400,000 acre-feet to California, 2,800,000 to Arizona, and 300,000 to Nevada; Arizona and California would each get one-half of any surplus. Prior approval was therefore given in the Act for a tri-state compact to incorporate these terms. The States, subject to subsequent congressional approval, were also permitted to agree on a compact with different terms. Division of the water did not, however, depend on the States' agreeing to a compact, for Congress gave the Secretary of the Interior adequate authority to accomplish the division. Congress did this by giving the Secretary power to make contracts for the delivery of water and by providing that no person could have water without a contract.

A. *Relevancy of Judicial Apportionment and Colorado River Compact.*—We agree with the Master that apportionment of the Lower Basin waters of the Colorado River is not controlled by the doctrine of equitable apportionment or by the Colorado River Compact. It is true that the Court has used the doctrine of equitable apportionment to decide river controversies between States.[34] But in those cases Congress had not made any statutory apportionment. In this case, we have decided that Congress has provided its own method for allocating among the Lower Basin States the mainstream water to which they are entitled under the Compact. Where Congress has so exercised its constitutional power over waters, courts have no power to substitute their own notions of an "equitable apportionment" for the apportionment chosen by Con-

[34] *E. g., Wyoming* v. *Colorado,* 259 U. S. 419 (1922); *Nebraska* v. *Wyoming,* 325 U. S. 589 (1945).

gress. Nor does the Colorado River Compact control this case. Nothing in that Compact purports to divide water among the Lower Basin States nor in any way to affect or control any future apportionment among those States or any distribution of water within a State. That the Commissioners were able to accomplish even a division of water between the basins is due to what is generally known as the "Hoover Compromise."

"Participants [in the Compact negotiations] have stated that the negotiations would have broken up but for Mr. Hoover's proposal: that the Commission limit its efforts to a division of water between the upper basin and the lower basin, leaving to each basin the future internal allocation of its share." [35]

And in fact this is all the Compact did. However, the Project Act, by referring to the Compact in several places, does make the Compact relevant to a limited extent. To begin with, the Act explicitly approves the Compact and thereby fixes a division of the waters between the basins which must be respected. Further, in several places the Act refers to terms contained in the Compact. For example, § 12 of the Act adopts the Compact definition of "domestic," [36] and § 6 requires satisfaction of "present perfected rights" as used in the Compact.[37] Obviously, therefore, those particular terms, though originally formulated only for the Compact's allocation of water between basins, are incorporated into the Act and are made applicable to the Project Act's allocation among Lower Basin

---

[35] H. R. Doc. No. 717, 80th Cong., 2d Sess. 22 (1948).

[36] " 'Domestic' whenever employed in this Act shall include water uses defined as 'domestic' in said Colorado River compact."

[37] The dam and reservoir shall be used, among other things, for "satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact."

States. The Act also declares that the Secretary of the Interior and the United States in the construction, operation, and maintenance of the dam and other works and in the making of contracts shall be subject to and controlled by the Colorado River Compact.[38] These latter references to the Compact are quite different from the Act's adoption of Compact terms. Such references, unlike the explicit adoption of terms, were used only to show that the Act and its provisions were in no way to upset, alter, or affect the Compact's congressionally approved division of water between the basins. They were not intended to make the Compact and its provisions control or affect the Act's allocation among and distribution of water within the States of the Lower Basin. Therefore, we look to the Compact for terms specifically incorporated in the Act, and we would also look to it to resolve disputes between the Upper and Lower Basins, were any involved in this case. But no such questions are here. We must determine what apportionment and delivery scheme in the Lower Basin has been effected through the Secretary's contracts. For that determination, we look to the Project Act alone.

B. *Mainstream Apportionment.*—The congressional scheme of apportionment cannot be understood without knowing what water Congress wanted apportioned. Under California's view, which we reject, the first 7,500,000 acre-feet of Lower Basin water, of which California has agreed to use only 4,400,000, is made up of both mainstream and tributary water, not just mainstream water. Under the view of Arizona, Nevada, and the United States, with which we agree, the tributaries are not included in the waters to be divided but remain for the exclusive use of each State. Assuming 7,500,000 acre-

---

[38] §§ 1, 8 (a), 13 (b) and (c).

feet or more in the mainstream and 2,000,000 in the tribu-
taries, California would get 1,000,000 acre-feet more if
the tributaries are included and Arizona 1,000,000 less.[39]

California's argument that the Project Act, like the
Colorado River Compact, deals with the main river and
all its tributaries rests on § 4 (a) of the Act, which limits
California to 4,400,000 acre-feet "of the waters appor-
tioned to the lower basin States by paragraph (a) of
Article III of the Colorado River compact, plus not more
than one-half of any excess or surplus waters unappor-
tioned by said compact . . . ." And Article III (a),
referred to by § 4 (a), apportioned in perpetuity to the
Lower Basin the use of 7,500,000 acre-feet of water per
annum "from the Colorado River System," which was
defined in the Compact as "that portion of the Colorado
River and its tributaries within the United States of
America."

Arizona argues that the Compact apportions between
basins only the waters of the mainstream, not the main-
stream and the tributaries. We need not reach that ques-
tion, however, for we have concluded that whatever waters
the Compact apportioned the Project Act itself dealt only
with water of the mainstream. In the first place, the Act,
in § 4 (a), states that the California limitation, which is
in reality her share of the first 7,500,000 acre-feet of Lower
Basin water, is on "water of and from the Colorado River,"
not of and from the "Colorado River System." But more
importantly, the negotiations among the States and the
congressional debates leading to the passage of the Project
Act clearly show that the language used by Congress in the
Act was meant to refer to mainstream waters only. Inclu-
sion of the tributaries in the Compact was natural in view
of the upper States' strong feeling that the Lower Basin

[39] Also, California would reduce Nevada's share of the mainstream
waters from 300,000 acre-feet to 120,500 acre-feet.

tributaries should be made to share the burden of any obligation to deliver water to Mexico which a future treaty might impose. But when it came to an apportionment among the Lower Basin States, the Gila, by far the most important Lower Basin tributary, would not logically be included, since Arizona alone of the States could effectively use that river.[40] Therefore, with minor exceptions, the proposals and counterproposals over the years, culminating in the Project Act, consistently provided for division of the mainstream only, reserving the tributaries to each State's exclusive use.

The most important negotiations among the States, which in fact formed the basis of the debates leading to passage of the Act, took place in 1927 when the Governors of the seven basin States met at Denver in an effort to work out an allocation of the Lower Basin waters acceptable to Arizona, California, and Nevada. Arizona and California made proposals,[41] both of which suggested giving Nevada 300,000 acre-feet out of the mainstream of the Colorado River and reserving to each State the exclusive use of her own tributaries. Arizona proposed that all remaining mainstream water be divided equally between herself and California, which would give each State 3,600,000 acre-feet out of the first 7,500,000 acre-feet of mainstream water. California rejected the proposed equal division of the water, suggesting figures that would result in her getting about 4,600,000 out of the 7,500,000. The Governors of the four Upper Basin States, trying to bring Arizona and California together, asked each State to reduce its demands and suggested this compromise: Nevada 300,000 acre-feet, Arizona 3,000,000, and California

---

[40] Not only does the Gila enter the Colorado almost at the Mexican border, but also in dry seasons it virtually evaporates before reaching the Colorado.

[41] See 69 Cong. Rec. 9454 (1928).

4,200,000.[42] These allocations were to come only out of the mainstream, that is, as stated by the Governors, out of "the average annual delivery of water to be provided by the states of the upper division at Lees Ferry, under the terms of the Colorado River Compact." The Governors' suggestions, like those of the States, explicitly reserved to each State as against the other States the exclusive use of her own tributaries. Arizona agreed to the Governors' proposal, but she wanted it made clear that her tributaries were to be exempted from any Mexican obligation.[43] California rejected the whole proposal, insisting that she must have 4,600,000 acre-feet from the mainstream, or, as she put it, "from the waters to be provided by the States of the upper division at Lee Ferry under the Colorado River compact."[44] Neither in the States' original offers, nor in the Governors' suggestions, nor in the States' responses was the "Colorado River System"—mainstream plus tributaries—ever used as the basis for Lower Basin allocations; rather, it was always mainstream water, or the water to be delivered by the upper States at Lee Ferry, that is to say, an annual average of 7,500,000 acre-feet of mainstream water.

With the continued failure of Arizona and California to reach accord, there was mounting impetus for a congressional solution. A Swing-Johnson bill containing no limitation on California's uses finally passed the House in 1928 over objections by Representatives from Arizona and Utah.[45] When the bill reached the Senate, it was amended in committee to provide that the Secretary in his water delivery contracts must limit California to 4,600,000 acre-feet "of the water allocated to the lower basin by

---

[42] See 70 Cong. Rec. 172 (1928).

[43] Hearings on H. R. 5773, *supra* note 25, at 30–31.

[44] *Id.*, at 402.

[45] H. R. 5773, 70th Cong., 1st Sess.; 69 Cong. Rec. 9989–9990 (1928).

the Colorado River compact . . . and one-half of the unallocated, excess, and/or surplus water . . . ."[46] On the floor, Senator Phipps of Colorado proposed an amendment which would allow the Act to go into effect without any limitation on California if seven States ratified the Compact; if only six States ratified and if the California Legislature accepted the limitation, the Act could still become effective.[47] Arizona's Senator Hayden had already proposed an amendment reducing California's share to 4,200,000 acre-feet (the Governors' proposal), plus half of the surplus, leaving Arizona exclusive use of the Gila free from any Mexican obligation,[48] but this the Senate rejected.[49] Senator Bratton of New Mexico, noting that only 400,000 acre-feet kept Arizona and California apart, immediately suggested an amendment by which they would split the difference, California getting 4,400,000 acre-feet "of the waters apportioned to the lower basin States by the Colorado River compact," plus half of the surplus.[50] It was this Bratton amendment that became part of the Act as passed,[51] which had been amended on the floor so that the limitation referred to waters apportioned to the Lower Basin "by paragraph (a) of Article III of the Colorado River compact," instead of waters apportioned "by the Colorado River compact."[52]

---

[46] S. Rep. No. 592, 70th Cong., 1st Sess. 2 (1928).

[47] 70 Cong. Rec. 324 (1928).

[48] Id., at 162.

[49] Id., at 384.

[50] Id., at 385.

[51] 45 Stat. 1057 (1928). Arizona's Senators Ashurst and Hayden voted against the bill, which did not exempt the Gila from the Mexican burden. 70 Cong. Rec. 603 (1928).

[52] 70 Cong. Rec. 459 (1928). That this change was not intended to cause the States to give up their tributaries may reasonably be inferred from the fact that the amendment was agreed to by Senator Hayden, who was a constant opponent of including the tributaries.

Statements made throughout the debates make it quite clear that Congress intended the 7,500,000 acre-feet it was allocating, and out of which California was limited to 4,400,000, to be mainstream water only. In the first place, the basin Senators expressly acknowledged as the starting point for their debate the Denver Governors' proposal that specific allocations be made to Arizona, California, and Nevada from the mainstream, leaving the tributaries to the States. For example, Senator Johnson, leading spokesman for California, and Senator Hayden, leading spokesman for Arizona, agreed that the Governors' recommendations could be used as "a basis for discussion." [53] Hayden went on to observe that the Committee amendment would give California the same 4,600,000 acre-feet she had sought at Denver. [54] Later, Nevada's Senator Pittman stated that the committee "put the amount in there that California demanded before the four governors at Denver," and said that the Bratton amendment would split the 400,000 acre-feet separating the Governors' figure and the Committee's figure. [55] All the leaders in the debate—Johnson, Bratton, King, Hayden, Phipps, and Pittman—expressed a common understanding that the key issue separating Arizona and California was the difference of 400,000 acre-feet, [56] precisely the same 400,000 acre-feet of mainstream water

---

[53] Id., at 77.

[54] Ibid. Later, Senator Hayden said that his amendment incorporated the Governors' proposal. Id., at 172–173.

[55] Id., at 386.

[56] Id., at 164 (King), 165 (Johnson, Bratton), 382 (Hayden, Phipps), 385 (Bratton), 386 (Pittman). Senator Hayden's statement is representative: "I want to state to the Senate that what I am trying to accomplish is to get a vote on the one particular question of whether the quantity of water which the State of California may divert from the Colorado River should be 4,200,000 acre-feet or 4,600,000 acre-feet." Id., at 382.

that had separated the States at Denver. Were we to sustain California's argument here that tributaries must be included, California would actually get more than she was willing to settle for at Denver.

That the apportionment was from the mainstream only is also strongly indicated by an analysis of the second paragraph of § 4 (a) of the Act. There Congress authorized Arizona, Nevada, and California to make a compact allocating to Nevada 300,000 acre-feet and to Arizona 2,800,000 plus one-half of the surplus, which, with California's 4,400,000 and half of the surplus, would under California's interpretation of the Act exhaust the Lower Basin waters, both mainstream and tributaries. But Utah and New Mexico, as Congress knew, had interests in Lower Basin tributaries which Congress surely would have protected in some way had it meant for the tributaries of those two States to be included in the water to be divided among Arizona, Nevada, and California. We cannot believe that Congress would have permitted three States to divide among themselves water belonging to five States. Nor can we believe that the representatives of Utah and New Mexico would have sat quietly by and acquiesced in a congressional attempt to include their tributaries in waters given the other three States.

Finally, in considering California's claim to share in the tributaries of other States, it is important that from the beginning of the discussions and negotiations which led to the Project Act, Arizona consistently claimed that she must have sole use of the Gila, upon which her existing economy depended.[57] Arizona's claim was supported by the fact that only she and New Mexico could effectively use the Gila waters, which not only entered the Colorado

---

[57] *E. g.*, Report, Colorado River Commission of Arizona (1927), reprinted in Hearings on H. R. 5773, *supra* note 25, at 25–31; 69 Cong. Rec. 9454 (1928) (Arizona's proposal at Denver).

River too close to Mexico to be of much use to any other
State but also was reduced virtually to a trickle in the
hot Arizona summers before it could reach the Colorado.
In the debates the Senators consistently acknowledged
that the tributaries—or at least the waters of the Gila,
the only major Arizona tributary—were excluded from
the allocation they were making. Senator Hayden, in
response to questions by Senator Johnson, said that the
California Senator was correct in stating that the Senate
had seen fit to give Arizona 2,800,000 acre-feet in addi-
tion to all the water in the Gila.[58]  Senator Johnson had
earlier stated, "[I]t is only the main stream, Senators will
recall, that has been discussed," and one of his arguments
in favor of California's receiving 4,600,000 acre-feet
rather than 4,200,000 was that Arizona was going to keep
all her tributaries in addition to whatever portion of the
main river was allocated to her.[59]  Senator Johnson also
argued that Arizona should bear more than half the Lower
Basin's Mexican burden because in addition to the
2,800,000 acre-feet allotted her by the Act she would get
the Gila, which he erroneously estimated at 3,500,000
acre-feet.[60]  Senator Pittman, who had sat in on the Gov-
ernors' conference, likewise understood that the water was
being allocated from "the main Colorado River." [61]  And
other interested Senators similarly distinguished between
the mainstream and the tributaries.[62]  While the debates,
extending over a long period of years, undoubtedly con-
tain statements which support inferences in conflict with
those we have drawn, we are persuaded by the legislative
history as a whole that the Act was not intended to give

[58] 70 Cong. Rec. 467–468 (1928).  See also *id.*, at 463–464, 465.

[59] *Id.*, at 237.

[60] *Id.*, at 466–467.

[61] *Id.*, at 469.  See also *id.*, at 232.

[62] See *id.*, at 463 (Shortridge); *id.*, at 465 (King).

California any claim to share in the tributary waters of the other Lower Basin States.

C. *The Project Act's Apportionment and Distribution Scheme.*—The legislative history, the language of the Act, and the scheme established by the Act for the storage and delivery of water convince us also that Congress intended to provide its own method for a complete apportionment of the mainstream water among Arizona, California, and Nevada.

First, the legislative history. In hearings on the House bill that became the Project Act, Congressman Arentz of Nevada, apparently impatient with the delay of this much needed project, told the committee on January 6, 1928, that if the States could not themselves allocate the water, "there must be some power which will say to California 'You can not take any more than this amount and the balance is allocated to the other States.' "[63] Later, May 25, 1928, the House passed the bill,[64] but it did not contain any allocation scheme. When the Senate took up that bill in December, pressure mounted swiftly for amendments that would provide a workable method for apportioning the waters among the Lower Basin States and distributing them to users in the States. The session convened on December 3, 1928, on the fifth the Senate took up the bill,[65] nine days later the bill with significant amendments passed the Senate,[66] four days after that the House concurred in the Senate's action,[67] and on the twenty-first the President signed the bill.[68] When the bill first reached the Senate floor, it had

[63] Hearings on H. R. 5773, *supra* note 25, at 50.
[64] 69 Cong. Rec. 9990 (1928).
[65] 70 Cong. Rec. 67 (1928).
[66] *Id.*, at 603.
[67] *Id.*, at 837–838.
[68] 45 Stat. 1057.

a provision, added in committee, limiting California to 4,600,000 acre-feet,[69] and Senator Hayden on December 6 proposed reducing that share to 4,200,000.[70] The next day, December 7, Mr. Pittman, senior Senator from Nevada, vigorously argued that Congress should settle the matter without delay. He said,

> "What is the difficulty? We have only minor questions involved here. There is practically nothing involved except a dispute between the States of Arizona and California with regard to the division of the increased water that will be impounded behind the proposed dam; that is all. . . . Of the 7,500,000 acre-feet of water let down that river they have gotten together within 400,000 acre-feet. They have got to get together, and if they do not get together Congress should bring them together." [71]

The day after that, December 8, New Mexico's Senator Bratton suggested an amendment splitting the difference between the demands of Arizona and California by limiting California to 4,400,000 acre-feet.[72] On the tenth, reflecting the prevailing sense of urgency for decisive action, Senator Bratton emphasized that this was not a dispute limited simply to two States:

> "The two States have exchanged views, they have negotiated, they have endeavored to reach an agreement, and until now have been unable to do so. This controversy does not affect those two States alone. It affects other States in the Union and the Government as well.

> "Without undertaking to express my views either way upon the subject, I do think that if the two

[69] See S. Rep. No. 592, 70th Cong., 1st Sess. 2 (1928).

[70] 70 Cong. Rec. 162 (1928).

[71] *Id.*, at 232.

[72] *Id.*, at 277, 385.

States are unable to agree upon a figure then that we, as a disinterested and friendly agency, should pass a bill which, according to our combined judgment, will justly and equitably settle the controversy. I suggested 4,400,000 acre-feet with that in view. I still hold to the belief that somewhere between the two figures we must fix the amount, and that this difference of 400,000 acre-feet should not be allowed to bar and preclude the passage of this important measure dealing with the enormous quantity of 15,000,000 acre-feet of water and involving seven States as well as the Government." [73]

The very next day, December 11, this crucial amendment was adopted,[74] and on the twelfth Senator Hayden pointed out that the bill settled the dispute over Lower Basin waters by giving 4,400,000 acre-feet to California and 2,800,000 to Arizona:

"One [dispute] is how the seven and a half million acre-feet shall be divided in the lower basin. The Senate has settled that by a vote—that California may have 4,400,000 acre-feet of that water. It follows logically that if that demand is to be conceded, as everybody agrees, the remainder is 2,800,000 acre-feet for Arizona. That settles that part of the controversy." [75]

On the same day, Senator Pittman, intimately familiar with the whole water problem,[76] summed up the feeling

---

[73] *Id.*, at 333.

[74] *Id.*, at 387.

[75] *Id.*, at 467. See also *id.*, at 465.

[76] For example, Senator Pittman's active role in resolving the whole Colorado River problem was acknowledged by Senator Hayden on the Senate floor:

"When Congress assembled in December, 1927, no agreement had been made. The senior Senator from Nevada [MR. PITTMAN], in

of the Senate that the bill fixed a limit on California and "practically allocated" to Arizona her share of the water:

> "The Senate has already determined upon the division of water between those States. How? It has determined how much water California may use, and the rest of it is subject to use by Nevada and Arizona. Nevada has already admitted that it can use only an insignificant quantity, 300,000 acre-feet. That leaves the rest of it to Arizona. As the bill now stands it is just as much divided as if they had mentioned Arizona and Nevada and the amounts they are to get . . . .

> "As I understand this amendment, Arizona to-day has practically allocated to it 2,800,000 acre-feet of water in the main Colorado River." [77]

The Senator went on to explain why the Senate had found it necessary to set up its own plan for allocating the water:

> "Why do we not leave it to California to say how much water she shall take out of the river or leave it to Arizona to say how much water she shall take out of the river? It is because it happens to become a duty of the United States Senate to settle this matter, and that is the reason." [78]

Not only do the closing days of the debate show that Congress intended an apportionment among the States

---

continuation of the earnest efforts that he has made all these years to bring about a settlement of the controversy between the States with respect to the Colorado River, invited a number of us to conferences in his office and there we talked over the situation." *Id.*, at 172.

[77] *Id.*, at 468–469.

[78] *Id.*, at 471. The Senator added, "We have already decided as to the division of the water, and we say that if the States wish they can enter into a subsidiary agreement confirming that." *Ibid.*

but also provisions of the Act create machinery plainly adequate to accomplish this purpose, whatever contingencies might occur. As one alternative of the congressional scheme, § 4 (a) of the Act invited Arizona, California, and Nevada to adopt a compact dividing the waters along the identical lines that had formed the basis for the congressional discussions of the Act: 4,400,000 acre-feet to California, 300,000 to Nevada, and 2,800,000 to Arizona. Section 8 (b) gave the States power to agree upon some other division, which would have to be approved by Congress. Congress made sure, however, that if the States did not agree on any compact the objects of the Act would be carried out, for the Secretary would then proceed, by making contracts, to apportion water among the States and to allocate the water among users within each State.

In the first section of the Act, the Secretary was authorized to "construct, operate, and maintain a dam and incidental works . . . adequate to create a storage reservoir of a capacity of not less than twenty million acre-feet of water . . ." for the stated purpose of "controlling the floods, improving navigation and regulating the flow of the Colorado River, providing for storage and for the delivery of the stored waters thereof for reclamation of public lands and other beneficial uses . . . ," and generating electrical power. The whole point of the Act was to replace the erratic, undependable, often destructive natural flow of the Colorado with the regular, dependable release of waters conserved and stored by the project. Having undertaken this beneficial project, Congress, in several provisions of the Act, made it clear that no one should use mainstream waters save in strict compliance with the scheme set up by the Act. Section 5 authorized the Secretary "under such general regulations as he may prescribe, to contract for the storage of water in said reservoir and for the delivery thereof at such points on the river . . . as may be agreed upon, for irrigation and

domestic uses . . . ." To emphasize that water could be obtained from the Secretary alone, § 5 further declared, "No person shall have or be entitled to have the use for any purpose of the water stored as aforesaid except by contract made as herein stated." The supremacy given the Secretary's contracts was made clear in § 8 (b) of the Act, which provided that, while the Lower Basin States were free to negotiate a compact dividing the waters, such a compact if made and approved after January 1, 1929, was to be "subject to all contracts, if any, made by the Secretary of the Interior under section 5" before Congress approved the compact.

These several provisions, even without legislative history, are persuasive that Congress intended the Secretary of the Interior, through his § 5 contracts, both to carry out the allocation of the waters of the main Colorado River among the Lower Basin States and to decide which users within each State would get water. The general authority to make contracts normally includes the power to choose with whom and upon what terms the contracts will be made. When Congress in an Act grants authority to contract, that authority is no less than the general authority, unless Congress has placed some limit on it.[79] In this respect it is of interest that in an earlier version the bill did limit the Secretary's contract power by making the contracts "subject to rights of prior appropriators."[80] But that restriction, which preserved the law of prior appropriation, did not survive. It was

---

[79] In the debates leading to the passage of the bill, Senator Walsh observed that "to contract means a liberty of contract" and asked if this did not mean that the Secretary could "give the water to them [appropriators] or withhold it from them as he sees fit," to which Senator Johnson answered "certainly." 70 Cong. Rec. 168 (1928).

[80] See Hearings on H. R. 6251 and 9826 before the Committee on Irrigation and Reclamation, 69th Cong., 1st Sess. 12 (1926).

stricken from the bill when the requirement that every water user have a contract was added to § 5.[81]   Significantly, no phrase or provision indicating that the Secretary's contract power was to be controlled by the law of prior appropriation was substituted either then or at any other time before passage of the Act, and we are persuaded that had Congress intended so to fetter the Secretary's discretion, it would have done so in clear and unequivocal terms, as it did in recognizing "present perfected rights" in § 6.

That the bill was giving the Secretary sufficient power to carry out an allocation of the waters among the States and among the users within each State without regard to the law of prior appropriation was brought out in a colloquy between Montana's Senator Walsh and California's Senator Johnson, whose State had at least as much reason as any other State to bind the Secretary by state laws. Senator Walsh, who was thoroughly versed in western water law and also had previously argued before this Court in a leading case involving the doctrine of prior appropriation,[82] made clear what would follow from the Government's impounding of the Colorado River waters when he said, "I always understood that the interest that stores the water has a right superior to prior appropriations that do not store."   He sought Senator Johnson's views on what rights the City of Los Angeles, which had filed claims to large quantities of Colorado River water, would have after the Government had built the dam and impounded the waters.   In reply to Senator Walsh's specific question whether the Government might "dispose of the stored water as it sees fit," Senator Johnson said,

---

[81] See *id.*, at 97, 115.

[82] *Bean v. Morris,* 221 U. S. 485 (1911). This case was relied on by Mr. Justice Van Devanter in *Wyoming v. Colorado,* 259 U. S. 419, 466 (1922).

"Yes; under the terms of this bill." Senator Johnson added that "everything in this scheme, plan, or design" was "dependent upon the Secretary of the Interior contracting with those who desire to obtain the benefit of the construction . . . ." He admitted that it was possible that the Secretary could "utterly ignore" Los Angeles' appropriations.[83]

In this same discussion, Senator Hayden emphasized the Secretary's power to allocate the water by making contracts with users. After Senator Walsh said that he understood Senator Johnson to be arguing that the Secretary must satisfy Los Angeles' appropriations, Senator Hayden corrected him, pointing out that Senator Johnson had qualified his statement by saying that "after all, the Secretary of the Interior could allow the city of Los Angeles to have such quantity of water as might be determined by contract." Senator Hayden went on to say that, where domestic and irrigation needs conflicted, "the Secretary of the Interior will naturally decide as between applicants, one who desires to use the water for potable purposes in the city and another who desires to use it for irrigation, if there is not enough water to go around, that the city shall have the preference." [84] It is also signifi-

---

[83] 70 Cong. Rec. 168 (1928). Other statements by Senator Johnson are less damaging to California's claims. For example, the Senator at another point in the colloquy with Senator Walsh said that he doubted if the Secretary either would or could disregard Los Angeles and contract with someone having no appropriation. *Ibid.* It is likely, however, that Senator Johnson was talking about present perfected rights, as a few minutes before he had argued that Los Angeles had taken sufficient steps in perfecting its claims to make them protected. See *id.*, at 167. Present perfected rights, as we have observed in the text, are recognized by the Act. § 6.

[84] 70 Cong. Rec. 169 (1928). At one point Senator Hayden seems to say that the Secretary's contracts are to be governed by state law: "The only thing required in this bill is contained in the amendment

cant that two vigorous opponents of the bill, Arizona's Representative Douglas and Utah's Representative Colton, criticized the bill because it gave the Secretary of the Interior "absolute control" over the disposition of the stored waters.[85]

The argument that Congress would not have delegated to the Secretary so much power to apportion and distribute the water overlooks the ways in which his power is limited and channeled by standards in the Project Act. In particular, the Secretary is bound to observe the Act's limitation of 4,400,000 acre-feet on California's consumptive uses out of the first 7,500,000 acre-feet of mainstream water. This necessarily leaves the remaining 3,100,000 acre-feet for the use of Arizona and Nevada, since they are the only other States with access to the main Colorado River. Nevada consistently took the position, accepted by the other States throughout the debates, that her conceivable needs would not exceed 300,000 acre-feet, which, of course, left 2,800,000 acre-feet for Arizona's use. Moreover, Congress indicated that it thought this a proper division of the waters when in the second paragraph of § 4 (a) it gave advance consent to a tri-state compact adopting

that I have offered, that there shall be apportioned to each State its share of the water. Then, who shall obtain that water in relative order of priority may be determined by the State courts." *Ibid.* But, in view of the Senator's other statements in the same debate, this remark of a man so knowledgeable in western water law makes sense only if one understands that the "order of priority" being talked about was the order of present perfected rights—rights which Senator Hayden recognized, see *id.*, at 167, and which the Act preserves in § 6.

[85] 69 Cong. Rec. 9623, 9648, 9649 (1928). We recognize, of course, that statements of opponents of a bill may not be authoritative, see *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 394–395 (1951), but they are nevertheless relevant and useful, especially where, as here, the proponents of the bill made no response to the opponents' criticisms.

such division. While no such compact was ever entered into, the Secretary by his contracts has apportioned the water in the approved amounts and thereby followed the guidelines set down by Congress. And, as the Master pointed out, Congress set up other standards and placed other significant limitations upon the Secretary's power to distribute the stored waters. It specifically set out in order the purposes for which the Secretary must use the dam and the reservoir:

> "First, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact; and third, for power." § 6.

The Act further requires the Secretary to make revenue provisions in his contracts adequate to ensure the recovery of the expenses of construction, operation, and maintenance of the dam and other works within 50 years after their construction. § 4 (b). The Secretary is directed to make water contracts for irrigation and domestic uses only for "permanent service." § 5. He and his permittees, licensees, and contractees are subject to the Colorado River Compact, § 8 (a), and therefore can do nothing to upset or encroach upon the Compact's allocation of Colorado River water between the Upper and Lower Basins. In the construction, operation, and management of the works, the Secretary is subject to the provisions of the reclamation law, except as the Act otherwise provides. § 14. One of the most significant limitations in the Act is that the Secretary is required to satisfy present perfected rights, a matter of intense importance to those who had reduced their water rights to actual beneficial use at the time the Act became effective. § 6. And, of course, all of the powers granted by the Act are exercised by the Secretary and his well-established executive department,

responsible to Congress and the President and subject to judicial review.[86]

Notwithstanding the Government's construction, ownership, operation, and maintenance of the vast Colorado River works that conserve and store the river's waters and the broad power given by Congress to the Secretary of the Interior to make contracts for the distribution of the water, it is argued that Congress in §§ 14 and 18 of the Act took away practically all the Secretary's power by permitting the States to determine with whom and on what terms the Secretary would make water contracts. Section 18 states:

> "Nothing herein shall be construed as interfering with such rights as the States now have either to the waters within their borders or to adopt such policies and enact such laws as they may deem necessary with respect to the appropriation, control, and use of waters within their borders . . . ."

Section 14 provides that the reclamation law, to which the Act is made a supplement, shall govern the management of the works except as otherwise provided, and § 8 of the Reclamation Act, much like § 18 of the Project Act, provides that it is not to be construed as affecting or interfering with state laws "relating to the control, appropriation, use, or distribution of water used in irrigation . . . ."[87] In our view, nothing in any of these pro-

---

[86] See, e. g., *Ickes* v. *Fox*, 300 U. S. 82 (1937); cf. *Best* v. *Humboldt Placer Mining Co.*, 371 U. S. 334 (1963); *Boesche* v. *Udall, ante*, p. 472.

[87] "Nothing in . . . [this Act] shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of such sections, shall proceed in conformity with such

visions affects our decision, stated earlier, that it is the Act and the Secretary's contracts, not the law of prior appropriation, that control the apportionment of water among the States. Moreover, contrary to the Master's conclusion, we hold that the Secretary in choosing between users within each State and in settling the terms of his contracts is not bound by these sections to follow state law.

The argument that § 8 of the Reclamation Act requires the United States in the delivery of water to follow priorities laid down by state law has already been disposed of by this Court in *Ivanhoe Irr. Dist.* v. *McCracken,* 357 U. S. 275 (1958), and reaffirmed in *City of Fresno* v. *California,* 372 U. S. 627 (1963). In *Ivanhoe* we held that, even though § 8 of the Reclamation Act preserved state law, that general provision could not override a specific provision of the same Act prohibiting a single landowner from getting water for more than 160 acres. We said:

> "As we read § 8, it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein. But the acquisition of water rights must not be confused with the operation of federal projects. As the Court said in *Nebraska* v. *Wyoming, supra,* at 615: 'We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system.' . . . We read nothing in § 8 that compels the United States to deliver water on conditions imposed by the State." *Id.,* at 291–292.

laws, and nothing . . . [herein] shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof." 43 U. S. C. § 383.

Since § 8 of the Reclamation Act did not subject the Secretary to state law in disposing of water in that case, we cannot, consistently with *Ivanhoe,* hold that the Secretary must be bound by state law in disposing of water under the Project Act.

Nor does § 18 of the Project Act require the Secretary to contract according to state law. That Act was passed in the exercise of congressional power to control navigable water for purposes of flood control, navigation, power generation, and other objects,[88] and is equally sustained by the power of Congress to promote the general welfare through projects for reclamation, irrigation, or other internal improvements.[89] Section 18 merely preserves such rights as the States "now" have, that is, such rights as they had at the time the Act was passed. While the States were generally free to exercise some jurisdiction over these waters before the Act was passed, this right was subject to the Federal Government's right to regulate and develop the river.[90] Where the Government, as here, has exercised this power and undertaken a comprehensive project for the improvement of a great river and for the orderly and beneficial distribution of water, there is no room for inconsistent state laws.[91] As in *Ivanhoe,* where the general provision preserving state law was held not to override a specific provision stating the terms for disposition of the water, here we hold that the general saving

---

[88] *Arizona* v. *California,* 283 U. S. 423 (1931).

[89] *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725, 738 (1950).

[90] *First Iowa Hydro-Elec. Coop.* v. *Federal Power Comm'n,* 328 U. S. 152, 171 (1946). See *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 62–72 (1913); *United States* v. *Willow River Power Co.,* 324 U. S. 499 (1945).

[91] See *Arizona* v. *California,* 283 U. S. 423 (1931); *Nebraska* v. *Wyoming,* 325 U. S. 589, 615 (1945); *First Iowa Hydro-Elec. Coop.* v. *Federal Power Comm'n,* 328 U. S. 152 (1946).

language of § 18 cannot bind the Secretary by state law and thereby nullify the contract power expressly conferred upon him by § 5.[92] Section 18 plainly allows the States to do things not inconsistent with the Project Act or with federal control of the river, for example, regulation of the use of tributary water and protection of present perfected rights.[93] What other things the States are free to do can be decided when the occasion arises. But where the Secretary's contracts, as here, carry out a congressional plan for the complete distribution of waters to users, state law has no place.[94]

Before the Project Act was passed, the waters of the Colorado River, though numbered by the millions of acre-feet, flowed too haltingly or too freely, resulting in droughts and floods. The problems caused by these conditions proved too immense and the solutions too costly for any one State or all the States together. In addition, the States, despite repeated efforts at a settlement, were unable to agree on how much water each State should get. With the health and growth of the Lower Basin at stake, Congress responded to the pleas of the States to come to their aid. The result was the Project Act and the

---

[92] *Nebraska* v. *Wyoming*, 325 U. S. 589 (1945), holds nothing to the contrary. There the Court found it unnecessary to decide what rights the United States had under federal law to the unappropriated water of the North Platte River, since the water rights on which the projects in that case rested had in fact been obtained in compliance with state law.

[93] See *First Iowa Hydro-Elec. Coop.* v. *Federal Power Comm'n*, 328 U. S. 152, 175–176 (1946), where this Court limited the effect of § 27 of the Federal Power Act, which expressly "saved" certain state laws, to vested property rights.

[94] By an Act of September 2, 1958, 72 Stat. 1726, the Secretary must supply water to Boulder City, Nevada. It follows from our conclusions as to the inapplicability of state law that, contrary to the Master's conclusion, Boulder City's priorities are not to be determined by Nevada law.

harnessing of the bountiful waters of the Colorado to sustain growing cities, to support expanding industries, and to transform dry and barren deserts into lands that are livable and productive.

In undertaking this ambitious and expensive project for the welfare of the people of the Lower Basin States and of the Nation, the United States assumed the responsibility for the construction, operation, and supervision of Boulder Dam and a great complex of other dams and works. Behind the dam were stored virtually all the waters of the main river, thus impounding not only the natural flow but also the great quantities of water previously allowed to run waste or to wreak destruction. The impounding of these waters, along with their regulated and systematic release to those with contracts, has promoted the spectacular development of the Lower Basin. Today, the United States operates a whole network of useful projects up and down the river, including the Hoover Dam, Davis Dam, Parker Dam, Headgate Rock Dam, Palo Verde Dam, Imperial Dam, Laguna Dam, Morelos Dam, and the All-American Canal System, and many lesser works. It was only natural that the United States, which was to make the benefits available and which had accepted the responsibility for the project's operation, would want to make certain that the waters were effectively used. All this vast, interlocking machinery—a dozen major works delivering water according to congressionally fixed priorities for home, agricultural, and industrial uses to people spread over thousands of square miles—could function efficiently only under unitary management, able to formulate and supervise a coordinated plan that could take account of the diverse, often conflicting interests of the people and communities of the Lower Basin States. Recognizing this, Congress put the Secretary of the Interior in charge of these works

and entrusted him with sufficient power, principally the § 5 contract power, to direct, manage, and coordinate their operation. Subjecting the Secretary to the varying, possibly inconsistent, commands of the different state legislatures could frustrate efficient operation of the project and thwart full realization of the benefits Congress intended this national project to bestow. We are satisfied that the Secretary's power must be construed to permit him, within the boundaries set down in the Act, to allocate and distribute the waters of the mainstream of the Colorado River.

## II.

### PROVISIONS IN THE SECRETARY'S CONTRACTS.

A. *Diversions above Lake Mead.*—The Secretary's contracts with Arizona and Nevada provide that any waters diverted by those States out of the mainstream or the tributaries above Lake Mead must be charged to their respective Lower Basin apportionments. The Master, however, took the view that the apportionment was to be made out of the waters actually stored at Lake Mead or flowing in the mainstream below Lake Mead. He therefore held that the Secretary was without power to charge Arizona and Nevada for diversions made by them from the 275-mile stretch of river between Lee Ferry and Lake Mead [95] or from the tributaries above Lake Mead. This conclusion was based on the Master's reasoning that the Secretary was given physical control over the waters stored in Lake Mead and not over waters before they reached the lake.

We hold that the Master was correct in deciding that the Secretary cannot reduce water deliveries to Arizona

[95] The location of Hoover Dam is a result of engineering decisions. As Senator Pittman pointed out, "There is no place to impound the flood waters except at the lower end of the canyon." 68 Cong. Rec. 4413 (1927).

and Nevada by the amount of their uses from tributaries above Lake Mead, for, as we have held, Congress in the Project Act intended to apportion only the mainstream, leaving to each State its own tributaries. We disagree, however, with the Master's holding that the Secretary is powerless to charge States for diversions from the mainstream above Lake Mead. What Congress was doing in the Project Act was providing for an apportionment among the Lower Basin States of the water allocated to that basin by the Colorado River Compact. The Lower Basin, with which Congress was dealing, begins at Lee Ferry, and it was all the water in the mainstream below Lee Ferry that Congress intended to divide among the States. Were we to refuse the Secretary the power to charge States for diversions from the mainstream between Lee Ferry and the damsite, we would allow individual States, by making diversions that deplete the Lower Basin's allocation, to upset the whole plan of apportionment arrived at by Congress to settle the long-standing dispute in the Lower Basin. That the congressional apportionment scheme would be upset can easily be demonstrated. California, for example, has been allotted 4,400,000 acre-feet of mainstream water. If Arizona and Nevada can, without being charged for it, divert water from the river above Lake Mead, then California could not get the share Congress intended her to have.

B. *Nevada Contract.*—Nevada has excepted to her inclusion in Paragraph II (B)(7) of the Master's recommended decree, which provides that "mainstream water shall be delivered to users in Arizona, California and Nevada only if contracts have been made by the Secretary of the Interior, pursuant to Section 5 of the Boulder Canyon Project Act, for delivery of such water." While the California contracts are directly with water users and the Arizona contract specifically contemplates further subcontracts with actual users, it is argued that the Nevada con-

tract, made by the Secretary directly with the State of Nevada through her Colorado River Commission, should be construed as a contract to deliver water to the State without the necessity of subcontracts by the Secretary directly with Nevada water users. The United States disagrees, contending that properly construed the Nevada contract, like the Secretary's general contract with Arizona, does not exhaust the Secretary's power to require Nevada water users other than the State to make further contracts. To construe the Nevada contract otherwise, the Government suggests, would bring it in conflict with the provision of § 5 of the Project Act that "No person shall have or be entitled to have the use for any purpose of the water stored as aforesaid except by contract [with the Secretary] made as herein stated." Acceptance of Nevada's contention here would not only undermine this plain congressional requirement that water users have contracts with the Secretary but would likewise transfer from the Secretary to Nevada a large part, if not all, of the Secretary's power to determine with whom he will contract and on what terms. We have already held that the contractual power granted the Secretary cannot be diluted in this manner. We therefore reject Nevada's contention.

## III.

### APPORTIONMENT AND CONTRACTS IN TIME OF SHORTAGE.

We have agreed with the Master that the Secretary's contracts with Arizona for 2,800,000 acre-feet of water and with Nevada for 300,000, together with the limitation of California to 4,400,000 acre-feet, effect a valid apportionment of the first 7,500,000 acre-feet of mainstream water in the Lower Basin. There remains the question of what shall be done in time of shortage. The Master, while declining to make any findings as to what future

supply might be expected, nevertheless decided that the Project Act and the Secretary's contracts require the Secretary in case of shortage to divide the burden among the three States in this proportion: California $\frac{4.4}{7.5}$; Arizona $\frac{2.8}{7.5}$; Nevada $\frac{.3}{7.5}$. While pro rata sharing of water shortages seems equitable on its face,[96] more considered judgment may demonstrate quite the contrary. Certainly we should not bind the Secretary to this formula. We have held that the Secretary is vested with considerable control over the apportionment of Colorado River waters. And neither the Project Act nor the water contracts require the use of any particular formula for apportioning shortages. While the Secretary must follow the standards set out in the Act, he nevertheless is free to choose among the recognized methods of apportionment or to devise reasonable methods of his own. This choice, as we see it, is primarily his, not the Master's or even ours. And the Secretary may or may not conclude that a pro rata division is the best solution.

It must be remembered that the Secretary's decision may have an effect not only on irrigation uses but also on other important functions for which Congress brought this great project into being—flood control, improvement of navigation, regulation of flow, and generation and distribution of electric power. Requiring the Secretary to prorate shortages would strip him of the very power of choice which we think Congress, for reasons satisfactory to it, vested in him and which we should not impair or take away from him. For the same reasons we cannot accept California's contention that in case of shortage each State's share of water should be determined by the

---

[96] Proration of shortage is the method agreed upon by the United States and Mexico to adjust Mexico's share of Colorado River water should there be insufficient water to supply each country's apportionment.

judicial doctrine of equitable apportionment or by the law of prior appropriation. These principles, while they may provide some guidance, are not binding upon the Secretary where, as here, Congress, with full power to do so, has provided that the waters of a navigable stream shall be harnessed, conserved, stored, and distributed through a government agency under a statutory scheme.

None of this is to say that in case of shortage, the Secretary cannot adopt a method of proration or that he may not lay stress upon priority of use, local laws and customs, or any other factors that might be helpful in reaching an informed judgment in harmony with the Act, the best interests of the Basin States, and the welfare of the Nation. It will be time enough for the courts to intervene when and if the Secretary, in making apportionments or contracts, deviates from the standards Congress has set for him to follow, including his obligation to respect "present perfected rights" as of the date the Act was passed. At this time the Secretary has made no decision at all based on an actual or anticipated shortage of water, and so there is no action of his in this respect for us to review. Finally, as the Master pointed out, Congress still has broad powers over this navigable international stream. Congress can undoubtedly reduce or enlarge the Secretary's power if it wishes. Unless and until it does, we leave in the hands of the Secretary, where Congress placed it, full power to control, manage, and operate the Government's Colorado River works and to make contracts for the sale and delivery of water on such terms as are not prohibited by the Project Act.

## IV.

### ARIZONA-NEW MEXICO GILA CONTROVERSY.

Arizona and New Mexico presented the Master with conflicting claims to water in the Gila River, the tributary

that rises in New Mexico and flows through Arizona. Having determined that tributaries are not within the regulatory provisions of the Project Act the Master held that this interstate dispute should be decided under the principles of equitable apportionment. After hearing evidence on this issue, the Master accepted a compromise settlement agreed upon by these States and incorporated that settlement in his findings and conclusions, and in Part IV (A)(B)(C)(D) of his recommended decree. No exceptions have been filed to these recommendations by any of the parties and they are accordingly accepted by us. Except for those discussed in Part V, we are not required to decide any other disputes between tributary users or between mainstream and tributary users.

## V.

### CLAIMS OF THE UNITED STATES.

In these proceedings, the United States has asserted claims to waters in the main river and in some of the tributaries for use on Indian Reservations, National Forests, Recreational and Wildlife Areas and other government lands and works. While the Master passed upon some of these claims, he declined to reach others, particularly those relating to tributaries. We approve his decision as to which claims required adjudication, and likewise we approve the decree he recommended for the government claims he did decide. We shall discuss only the claims of the United States on behalf of the Indian Reservations.

The Government, on behalf of five Indian Reservations in Arizona, California, and Nevada, asserted rights to water in the mainstream of the Colorado River.[97] The

[97] The Reservations were Chemehuevi, Cocopah, Yuma, Colorado River and Fort Mohave.

Colorado River Reservation, located partly in Arizona and partly in California, is the largest. It was originally created by an Act of Congress in 1865,[98] but its area was later increased by Executive Order.[99] Other reservations were created by Executive Orders and amendments to them, ranging in dates from 1870 to 1907.[100] The Master found both as a matter of fact and law that when the United States created these reservations or added to them, it reserved not only land but also the use of enough water from the Colorado to irrigate the irrigable portions of the reserved lands. The aggregate quantity of water which the Master held was reserved for all the reservations is about 1,000,000 acre-feet, to be used on around 135,000 irrigable acres of land. Here, as before the Master, Arizona argues that the United States had no power to make a reservation of navigable waters after Arizona became a State; that navigable waters could not be reserved by Executive Orders; that the United States did not intend to reserve water for the Indian Reservations; that the amount of water reserved should be measured by the reasonably foreseeable needs of the Indians living on the reservation rather than by the number of irrigable acres; and, finally, that the judicial doctrine of equitable appor-

[98] Act of March 3, 1865, 13 Stat. 541, 559.

[99] See Executive Orders of November 22, 1873, November 16, 1874, and May 15, 1876. See also Executive Order of November 22, 1915. These orders may be found in 1 U. S. Dept. of the Interior, Executive Orders Relating to Indian Reservations 6-7 (1912); 2 id., at 5-6 (1922).

[100] Executive Orders of January 9, 1884 (Yuma), September 19, 1890 (Fort Mohave), February 2, 1911 (Fort Mohave), September 27, 1917 (Cocopah). For these orders, see 1 id., at 12-13, 63-64 (1912); 2 id., at 5 (1922). The Chemehuevi Reservation was established by the Secretary of the Interior on February 2, 1907, pending congressional approval

tionment should be used to divide the water between the Indians and the other people in the State of Arizona.

The last argument is easily answered. The doctrine of equitable apportionment is a method of resolving water disputes between States. It was created by this Court in the exercise of its original jurisdiction over controversies in which States are parties. An Indian Reservation is not a State. And while Congress has sometimes left Indian Reservations considerable power to manage their own affairs, we are not convinced by Arizona's argument that each reservation is so much like a State that its rights to water should be determined by the doctrine of equitable apportionment. Moreover, even were we to treat an Indian Reservation like a State, equitable apportionment would still not control since, under our view, the Indian claims here are governed by the statutes and Executive Orders creating the reservations.

Arizona's contention that the Federal Government had no power, after Arizona became a State, to reserve waters for the use and benefit of federally reserved lands rests largely upon statements in *Pollard's Lessee* v. *Hagan,* 3 How. 212 (1845), and *Shively* v. *Bowlby,* 152 U. S. 1 (1894). Those cases and others that followed them [101] gave rise to the doctrine that lands underlying navigable waters within territory acquired by the Government are held in trust for future States and that title to such lands is automatically vested in the States upon admission to the Union. But those cases involved only the shores of and lands beneath navigable waters. They do not determine the problem before us and cannot be accepted as limiting the broad powers of the United States to regulate navigable waters under the Commerce Clause and to regulate

[101] See, *e. g., United States* v. *California,* 332 U. S. 19, 29–30 (1947); *United States* v. *Holt State Bank,* 270 U. S. 49, 54–55 (1926).

government lands under Art. IV, § 3, of the Constitution. We have no doubt about the power of the United States under these clauses to reserve water rights for its reservations and its property.

Arizona also argues that, in any event, water rights cannot be reserved by Executive Order. Some of the reservations of Indian lands here involved were made almost 100 years ago, and all of them were made over 45 years ago. In our view, these reservations, like those created directly by Congress, were not limited to land, but included waters as well. Congress and the Executive have ever since recognized these as Indian Reservations. Numerous appropriations, including appropriations for irrigation projects, have been made by Congress. They have been uniformly and universally treated as reservations by map makers, surveyors, and the public. We can give but short shrift at this late date to the argument that the reservations either of land or water are invalid because they were originally set apart by the Executive.[102]

Arizona also challenges the Master's holding as to the Indian Reservations on two other grounds: first, that there is a lack of evidence showing that the United States in establishing the reservations intended to reserve water for them; second, that even if water was meant to be reserved the Master has awarded too much water. We reject both of these contentions. Most of the land in these reservations is and always has been arid. If the water necessary to sustain life is to be had, it must come from the Colorado River or its tributaries. It can be said without overstatement that when the Indians were put on these reservations they were not considered to be located in the most desirable area of the Nation. It is

---

[102] See *United States v. Midwest Oil Co.*, 236 U. S. 459, 469–475 (1915); *Winters v. United States*, 207 U. S. 564 (1908).

impossible to believe that when Congress created the great Colorado River Indian Reservation and when the Executive Department of this Nation created the other reservations they were unaware that most of the lands were of the desert kind—hot, scorching sands—and that water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised. In the debate leading to approval of the first congressional appropriation for irrigation of the Colorado River Indian Reservation, the delegate from the Territory of Arizona made this statement:

"Irrigating canals are essential to the prosperity of these Indians. Without water there can be no production, no life; and all they ask of you is to give them a few agricultural implements to enable them to dig an irrigating canal by which their lands may be watered and their fields irrigated, so that they may enjoy the means of existence. You must provide these Indians with the means of subsistence or they will take by robbery from those who have. During the last year I have seen a number of these Indians starved to death for want of food." Cong. Globe, 38th Cong., 2d Sess. 1321 (1865).

The question of the Government's implied reservation of water rights upon the creation of an Indian Reservation was before this Court in *Winters* v. *United States,* 207 U. S. 564, decided in 1908. Much the same argument made to us was made in *Winters* to persuade the Court to hold that Congress had created an Indian Reservation without intending to reserve waters necessary to make the reservation livable. The Court rejected all of the arguments. As to whether water was intended to be reserved, the Court said, at p. 576:

"The lands were arid and, without irrigation, were practically valueless. And yet, it is contended, the

means of irrigation were deliberately given up by the Indians and deliberately accepted by the Government. The lands ceded were, it is true, also arid; and some argument may be urged, and is urged, that with their cession there was the cession of the waters, without which they would be valueless, and 'civilized communities could not be established thereon.' And this, it is further contended, the Indians knew, and yet made no reservation of the waters. We realize that there is a conflict of implications, but that which makes for the retention of the waters is of greater force than that which makes for their cession."

The Court in *Winters* concluded that the Government, when it created that Indian Reservation, intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless. *Winters* has been followed by this Court as recently as 1939 in *United States* v. *Powers*, 305 U. S. 527. We follow it now and agree that the United States did reserve the water rights for the Indians effective as of the time the Indian Reservations were created. This means, as the Master held, that these water rights, having vested before the Act became effective on June 25, 1929, are "present perfected rights" and as such are entitled to priority under the Act.

We also agree with the Master's conclusion as to the quantity of water intended to be reserved. He found that the water was intended to satisfy the future as well as the present needs of the Indian Reservations and ruled that enough water was reserved to irrigate all the practicably irrigable acreage on the reservations. Arizona, on the other hand, contends that the quantity of water reserved should be measured by the Indians' "reasonably foreseeable needs," which, in fact, means by the number

of Indians. How many Indians there will be and what their future needs will be can only be guessed. We have concluded, as did the Master, that the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage. The various acreages of irrigable land which the Master found to be on the different reservations we find to be reasonable.

We disagree with the Master's decision to determine the disputed boundaries of the Colorado River Indian Reservation and the Fort Mohave Indian Reservation. We hold that it is unnecessary to resolve those disputes here. Should a dispute over title arise because of some future refusal by the Secretary to deliver water to either area, the dispute can be settled at that time.

The Master ruled that the principle underlying the reservation of water rights for Indian Reservations was equally applicable to other federal establishments such as National Recreation Areas and National Forests. We agree with the conclusions of the Master that the United States intended to reserve water sufficient for the future requirements of the Lake Mead National Recreation Area, the Havasu Lake National Wildlife Refuge, the Imperial National Wildlife Refuge and the Gila National Forest.

We reject the claim of the United States that it is entitled to the use, without charge against its consumption, of any waters that would have been wasted but for salvage by the Government on its wildlife preserves. Whatever the intrinsic merits of this claim, it is inconsistent with the Act's command that consumptive use shall be measured by diversions less returns to the river.

Finally, we note our agreement with the Master that all uses of mainstream water within a State are to be charged against that State's apportionment, which of course includes uses by the United States.

## VI.

### DECREE.

While we have in the main agreed with the Master, there are some places we have disagreed and some questions on which we have not ruled. Rather than adopt the Master's decree with amendments or append our own decree to this opinion, we will allow the parties, or any of them, if they wish, to submit before September 16, 1963, the form of decree to carry this opinion into effect, failing which the Court will prepare and enter an appropriate decree at the next Term of Court.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

[For opinion of MR. JUSTICE HARLAN, joined by MR. JUSTICE DOUGLAS and MR. JUSTICE STEWART, see *post*, p. 603.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, see *post*, p. 627.]

COLORADO RIVER BASIN

LOCATION MAP

PREPARED BY STATE OF CALIFORNIA

MR. JUSTICE HARLAN, whom MR. JUSTICE DOUGLAS and MR. JUSTICE STEWART join, dissenting in part.

I dissent from so much of the Court's opinion as holds that the Secretary of the Interior has been given authority by Congress to apportion, among and within the States of California, Arizona, and Nevada, the waters of the mainstream of the Colorado River below Lee Ferry. I also dissent from the holding that in times of shortage the Secretary has discretion to select or devise any "reasonable method" he wishes for determining which users within these States are to bear the burden of that shortage. (In all other respects MR. JUSTICE STEWART and I—but not MR. JUSTICE DOUGLAS—agree with and join in the Court's opinion, though not without some misgivings regarding the amounts of water allocated to the Indian Reservations.)

In my view, it is the equitable principles established by the Court in interstate water-rights cases, as modified by the Colorado River Compact and the California limitation, that were intended by Congress to govern the apportionment of mainstream waters among the Lower Basin States, whether in surplus or in shortage. *A fortiori,* state law was intended to control apportionment among users within a single State.

## I.

### INTRODUCTION.

The Court's conclusions respecting the Secretary's apportionment powers, particularly those in times of shortage, result in a single appointed federal official being vested with absolute control, unrestrained by adequate standards, over the fate of a substantial segment of the life and economy of three States. Such restraint upon his actions as may follow from judicial review are, as will

be shown, at best illusory. Today's result, I venture to say, would have dumbfounded those responsible for the legislation the Court construes, for nothing could have been farther from their minds or more inconsistent with their deeply felt convictions.

The Court professes to find this extraordinary delegation of power principally in § 5 of the Project Act, the provision authorizing the Secretary to enter into contracts for the storage and delivery of water. But § 5, as is more fully shown below, pp. 615–621, *infra*, had no design resembling that which the Court now extracts from it. Rather, it was intended principally as a revenue measure, and the clause *requiring* a contract as a condition of delivery was inserted at the insistence not of the Lower but of the Upper Basin States in an effort to insure that nothing would disturb that basin's rights under the Colorado River Compact. There was no thought that § 5 would give authority to apportion water among the Lower Basin States. Indeed, during the hearings on the third Swing-Johnson bill when § 5 took its present form, one of its principal proponents, Delph Carpenter of Colorado, specifically stated that the proposed condition of a contract was intended to require

> "that the persons who receive the water shall respect and do so under the compact. *It has nothing to do with the interstate relations between Arizona and California.*" [1] (Emphasis added.)

And Representative Swing, coauthor of the bill, made virtually the same point in explaining the provision before the House Rules Committee:

> "The act says [in § 5] 'The Secretary of the Interior is hereby authorized, under such general regulations

[1] Hearings before House Committee on Irrigation and Reclamation on H. R. 6251 and H. R. 9826, 69th Cong., 1st Sess. 163.

as he may prescribe, to contract for the storage of water.' Whose water? It does not say. It might be a community like Imperial Valley that has already acquired a water right . . . or it may be someone who hereafter will acquire a water right, but that right will not be acquired under this bill; *not from the United States Government.* He will acquire his water right, if he acquires one, from the State and under the laws of the State, in which he puts the water to a beneficial use. *There is nothing in this bill which puts the Government in conflict with the water laws of Arizona or Utah or any other State.* As a matter of fact, the reclamation law is adopted by section 13 of this bill [now § 14], and section 8 of the reclamation act says that *what the Government does must not be in conflict with the water laws of the States, so there can be no violence done State laws on this score."* [2] (Emphasis added.)

The Court concedes, as indeed it must in the face of such unequivocal evidence, that this third Swing-Johnson bill, like its predecessors, established "no method whatever of apportioning the waters among the States of the Lower Basin." *Ante,* p. 560. This concession, one would think, would end this aspect of the controversy, since § 5 as ultimately adopted is virtually the same as that proposed in the third bill.[3] Yet a method of federal apportionment is discovered in the fourth Swing-Johnson bill as finally enacted, a method which ends by delegating to the Secre-

[2] Hearings before House Committee on Rules on H. R. 9826, 69th Cong., 2d Sess. 116. The bill then under consideration, as recommended by the House Committee on Irrigation and Reclamation, appears in H. R. Rep. No. 1657, 69th Cong., 2d Sess. 29–34.

[3] The only change that need be noted for present purposes is the addition of a clause requiring contracts to conform to § 4 (a), discussed below, as well as to the Compact.

tary of the Interior the awesome power over the "water" destiny of three States. To what provision does the Court attribute this startling metamorphosis? The fundamental change in approach is apparently found in § 4 (a), which as adopted contains provisions (1) conditioning the effectiveness of the Act on seven-state ratification of the Colorado River Compact or alternatively on California's agreement to limit its annual consumption of Colorado River water, together with six-state ratification of the Compact; and (2) giving permission to California, Arizona, and Nevada to enter a further compact apportioning certain waters to the latter two States pursuant to a stated formula.

It is manifest that § 4 (a), on which the Court so heavily relies, neither apportions the waters of the river nor vests power in any official to make such an apportionment. The first paragraph does not *grant* any water to anyone; it merely conditions the Act's effectiveness on seven-state ratification of the Compact or on six-state ratification, plus California's agreement to a limitation, *i. e.*, a *ceiling*, on her appropriations. The source of authority to make such appropriations must be found elsewhere. And the second paragraph of § 4 (a), suggesting a particular interstate agreement, similarly makes no apportionment of water among the States and delegates no power to any official to make such an apportionment. Indeed, it was accepted by the Senator from California (Mr. Johnson) only after the following colloquy with its proponent, Senator Pittman of Nevada:

> "Mr. JOHNSON. . . . [W]hat I want to make clear is that this amendment shall not be construed hereafter by any of the parties to it or any of the States as being the expression of the will or the demand or the request of the Congress of the United States.

"Mr. PITTMAN. Exactly, not.

"Mr. JOHNSON. Very well, then.

"Mr. PITTMAN. It is not the request of Congress.

"Mr. JOHNSON. I accept the amendment, then."

70 Cong. Rec. 472.

Senator Johnson would surely have been surprised to learn that the formula which was not even "the request of Congress" was in truth one which the Secretary was authorized to force down the throats of the States if they did not voluntarily agree to it.

Even this brief summary, I think, casts the gravest doubts upon the Court's construction of the Project Act as abolishing state law and accepted principles of equitable apportionment in effecting allocations of water among the States. A more detailed analysis will, I believe, demonstrate the incorrectness of the Court's conclusions on this score and will reveal the constitutional difficulties inherent in the uncontrolled delegation of power resulting from those conclusions.

## II.

### The Background of the Boulder Canyon Project Act.

Judicial apportionment of interstate waters was established long before the Project Act as an effective means of resolving interstate water disputes. *Kansas* v. *Colorado,* 206 U. S. 46. Its acceptability had never been questioned. Priority of appropriation, the basic determinant of judicial apportionment as enunciated in *Wyoming* v. *Colorado,* 259 U. S. 419, was the law in six of the Colorado Basin States,[4] and senior appropriations were

[4] Arizona: *Clough* v. *Wing,* 2 Ariz. 371, 17 P. 453; Colorado: *Coffin* v. *Left Hand Ditch Co.,* 6 Colo. 443; Nevada: *Jones* v. *Adams,*

respected in the seventh.[5]   The law of appropriation, which rests on the basic principle that a water right depends on beneficial use and which gives priority of right to the appropriator first in time, had been repeatedly declared to be indispensable to the development of the arid lands of the West.[6]

This backdrop of firm dedication to the principles of appropriation and of judicial apportionment is critical to an understanding of congressional purpose with respect to the Project Act.   It is also critical to recognize that congressional compromise with these deeply respected principles was only partial; the problems facing Congress as a result of *Wyoming* v. *Colorado* were narrow.   No Senator or Representative ever suggested that judicial apportionment was generally inappropriate; no Senator or Representative ever inveighed against the law of appropriation as such.   The first problem was simply this: Interstate application of the doctrine of priority, unlimited by equitable considerations, threatened to deprive the four Upper Basin States of their fair share of the Colorado River because they were not so quick as California in development.   The purpose of the Compact was simply to limit traditional doctrines to the extent necessary to

---

19 Nev. 78, 6 P. 442; New Mexico: *Albuquerque Land & Irr. Co.* v. *Gutierrez,* 10 N. Mex. 177, 61 P. 357; Utah: *Stowell* v. *Johnson,* 7 Utah 215, 26 P. 290; Wyoming: *Moyer* v. *Preston,* 6 Wyo. 308, 44 P. 845.

[5] California: *Osgood* v. *El Dorado Water & Deep Gravel Mining Co.,* 56 Cal. 571.

[6] *E. g., Coffin* v. *Left Hand Ditch Co.,* 6 Colo. 443, 446–447, 449–450; *Stowell* v. *Johnson,* 7 Utah 215, 225, 26 P. 290, 291; *Willey* v. *Decker,* 11 Wyo. 496, 515–524, 73 P. 210, 215–218.   "Irrigation," said the Nevada court, ". . . would be strangled by the enforcement of the riparian principle." *Twaddle* v. *Winters,* 29 Nev. 88, 106, 85 P. 280, 284.

avoid this extreme and harsh result, and to eliminate long and costly litigation.

It was perfectly plain that the Colorado River Compact merely guaranteed to the upper States a specified quantity of water immune from priorities below, subject to stated delivery requirements; it did nothing whatever to interfere with the law of priorities or the principles of equitable apportionment among the States of the Lower Basin.[7] It was precisely because it did not that Arizona refused to approve either the Project Act or the Compact until something was done to safeguard her share of Lower Basin water.[8] Similarly, the upper States feared that in the absence of ratification by Arizona, California would be free to appropriate all the Lower Basin's share under the Compact, and Arizona, not limited by that document, would be free to appropriate, as against the upper States, water the Compact sought to apportion to the Upper Basin.[9]

The remaining problem, therefore, was that California's acquisition of priorities as against Arizona and the upper States had to be further limited. A ceiling had to be put on her interstate appropriative priorities. Solution of this narrow problem likewise did not require complete abrogation of the principles of priority and interstate judicial apportionment.

Still another, and profoundly significant, factor in understanding the effect of the Project Act on the law

[7] Ward Bannister, Denver attorney and spokesman for the Upper Basin States, said that "[t]he purpose of the compact is to provide the three lower States with a fund of water from which they may appropriate and the four upper States with a fund of water from which they may appropriate." Hearings before House Committee on Irrigation and Reclamation on H. R. 2903, 68th Cong., 1st Sess. 232.

[8] See the remarks of Senator Hayden, 70. Cong. Rec. 388.

[9] See, e. g., H. R. Rep. No. 1657, 69th Cong., 2d Sess., pt. 2, 3–4; Hearings, supra, note 2, at 34–37.

of appropriation and judicial apportionment is the pervasive hostility that many westerners had to any form of federal control of water rights. Colorado's Delph Carpenter, who was as much responsible as any man for both the Compact and the contract requirement of § 5 of the Project Act, testified in 1925 to what he termed an insidious and calculated policy of the National Government, fostered particularly by the Departments of Interior and Justice, to encroach upon state prerogatives and supersede state authority with respect to the distribution of water. He made it clear, as did Wyoming's Senator Kendrick, that he deemed this policy oppressive, destructive, and deplorable.[10] Utah's Senator King made the same objection on the floor of the Senate. 69 Cong. Rec. 10262. When it was suggested that Congress might legislate to meet the problem of California's threatened preemption of the river, a storm of doubt arose as to its constitutional power to do so. Upper Basin and Arizona spokesmen—those who were to be benefited by limiting appropriations—repeatedly insisted that the only constitutional ways of apportioning the river were by suit in

---

[10] Hearings before Senate Committee on Irrigation and Reclamation pursuant to S. Res. No. 320, 68th Cong., 2d Sess. 663–675. "It was the oppression of the National Government strangling development, preventing development in the States. . . . These two experiences and others taught Colorado, Wyoming, and New Mexico the extent to which a department of the United States would go in overriding State authority and oppressing whole communities. . . . Thus it came to the attention of the States, that the United States Government intended to supersede all State law and override State authority on that river. . . . [A]ny desire by a governmental bureau to ultimately, by insiduous [sic] or other methods, take over the control and dominion of the streams within the States and to override State authority at once becomes not only abhorrent but gives rise to a feeling of bitter resentment and sounds a call to arms for self-defense. . . ." Id., at 663, 665, 671, 673. See also his remarks at Hearings, supra, note 1, at 146–157.

this Court or by interstate compact.[11]   And Senator Bratton of New Mexico, hardly an opponent of the Project Act, objected that by merely suggesting in § 4 (a) the terms of a compact which the States were free to modify

---

[11] Senator KING: "If the Senator means by his statement that the Federal Government may go into a stream, whether it be the Colorado River, the Sacramento River, or a river in the State of Montana, and put its powerful hands down upon the stream and say, 'This is mine; I can build a dam there and allocate water to whom I please, regardless of other rights, either suspended, inchoate, or perfected,' I deny the position which the Senator takes." 70 Cong. Rec. 169. The Senator in question was Carl Hayden; he denied that his statement, which concerned his authorization for a compact among the three lower States, meant any such thing.

Senator PHIPPS: "I am firmly convinced that there must be voluntary ratification on the part of each interested State in order to make the compact effective. This is the only method of settling possible controversies permanently and of putting the water of the stream to its highest beneficial use. It is the only satisfactory method; it is the only legal method to avoid proceedings in the courts which would prove costly and almost interminable." 68 Cong. Rec. 4515.

Senator HAYDEN: "There are only two ways in which this controversy can be settled. Either the States can agree upon an equitable apportionment of waters of the Colorado River or, in the absence of a compact, the Supreme Court of the United States can determine what the rights of the various States are in on [sic] that stream. . . . *Arizona denies that it is within the power of Congress to apportion the waters of an interstate stream among the States.*" Hearings, supra, note 2, at 75, 76. (Emphasis added.)

Representative COLTON: "I have been informed that an attorney for the Reclamation Service of the United States claims that Congress has the power to allocate and apportion all of the Colorado River among the States regardless of their wishes in the matter. Such a theory is abhorrent to our whole plan of government and particularly to the theory on which our whole system of water rights has been built up." Hearings before House Committee on Irrigation and Reclamation on H. R. 5773, 70th Cong., 1st Sess. 414.

Representative LEATHERWOOD: "[T]here are only two agencies that can allocate the waters of this great river, the States themselves

or to reject, Congress was infringing upon state sovereignty.   70 Cong. Rec. 470–471.

Congress' entire approach to the problems of prior appropriation was governed by this deep-seated hostility to federal dictation of water rights.   When plans for development of the Lower Basin threatened the rights of the upper States, they did not seek the simple (and in my view constitutionally unobjectionable) solution of a legislative apportionment.  They employed instead the cumbersome method of interstate compact, which required authorization by Congress and by seven state legislatures prior to negotiation and ratification by the same eight bodies thereafter.   When it began to appear that Arizona would not ratify the Compact, Congress still did not legislate a general apportionment.   It built the statute around the provisions of the Compact, insisting on ratification by as many States as possible, even at the cost of further delaying the already overdue Project Act. It simply conditioned the use of government property and of water stored behind the dam on compliance with the Compact.   Attempts to divide the Lower Basin water by interstate agreement continued through the Denver Conference called by the Upper Basin Governors in the summer of 1927—nearly five years after negotiation of

---

by treaty ratified by the Congress of the United States, or by the judicial branch of the Government; for the Congress has no power to allocate any of the waters of this river or any other river where the doctrine of prior appropriation is in force." Hearings, *supra*, note 2, at 31.

WARD BANNISTER: "[T]here is nothing in the Federal Constitution upon which to base the power of the Federal Government to divide this water among the States. . . . [T]he same thing that would invalidate a provision inserted by Congress direct would invalidate any rule promulgated by the Secretary of the Interior under Congressional permission, and the upper States would find themselves utterly helpless." Hearings, *supra*, n. 7, at 195.

the Compact. Yet it was not until 1927 that an amendment was first offered to protect Arizona by a statutory limitation on California's consumption, and it was not until 1928 that the proposal was adopted into the bill.[12]

Finally, when Congress ultimately resigned itself to the necessity of legislating in some way with respect to the division of Lower Basin waters, it used narrow words suitable to its narrow purpose and to its regard both for the system of judicial apportionment and appropriation and for the rights of the States. Even then Congress did not attempt to legislate an apportionment of Lower Basin water; it simply prescribed a ceiling for California. In the words of Senator Johnson, "We write, then, that California shall use perpetually only a specific amount of water, naming the maximum amount which may be used." 69 Cong. Rec. 7250. Even this, Congress was unwilling to do directly. As reported from committee, the bill contained a provision directing the Secretary of the Interior to limit California's consumption in the exercise of his power of contract.[13] But this was replaced by the present provision, which reached the same result not via the Secretary's contract authority but by the awkward device of requiring California's legislature to consent to the limitation as a condition precedent to the effectiveness of the Project Act. And this was not all; to end the tale Congress added to § 4 (a) specific authorization to Arizona, California, and Nevada to enter into an agreement to complete the division of the Lower Basin water—the same cumbersome substitute for direct congressional apportionment that had been abortively mooted for six years.

This history bears recapitulation. *First,* the law of appropriation, basic to western water law, was greatly

---

[12] 68 Cong. Rec. 4763; S. Rep. No. 592, 70th Cong., 1st Sess. 2.
[13] S. Rep. No. 592, 70th Cong., 1st Sess. 2.

respected, and the solution of interstate water disputes by judicial apportionment in this Court was well established and accepted. *Second,* the problems created by these doctrines as applied in *Wyoming* v. *Colorado* were narrow ones, not requiring for their solution complete abrogation of well-tried principles; existing law was quite adequate to deal with all questions save those Congress expressly solved by imposing a ceiling on California. *Third,* Congress throughout the dispute exhibited great reluctance to interfere with the division of water by legislation, because of a deep and fundamental mistrust of federal intervention and a profound regard for state sovereignty, shared by many influential members. *Finally,* when Congress was forced to legislate with respect to this problem or face defeat of the entire Project Act, it chose narrow terms appropriate to the narrow problem before it, and even then acted only indirectly to require California's consent to limiting her consumption.

It is inconceivable that such a Congress intended that the sweeping federal power which it declined to exercise—a power even the most avid partisans of national authority might hesitate to grant to a single administrator—be exercised at the unbridled discretion of an administrative officer, especially in the light of complaints registered about "bureaucratic" and "oppressive" interference of the Department which that very officer headed.[14] It is utterly incredible that a Congress unwilling because of concern for States' rights even to limit California's maximum consumption to 4,400,000 acre-feet without the consent of her legislature intended to give the Secretary of the Interior authority without California's consent to reduce her share even below that quantity in a shortage.

---

[14] See note 10, *supra,* and accompanying text.

## III.

### THE AUTHORITY OF THE SECRETARY UNDER SECTION 5 OF THE PROJECT ACT.

The Court holds that § 5 of the Project Act, which empowers the Secretary to contract for water delivery and forbids delivery of stored water without a contract, displaces the law of apportionment among the Lower Basin States, giving the Secretary power to divide the water by contract and to distribute the burden of shortages, without respecting appropriations.

But it does not follow that because no user is entitled to stored water without a contract the Secretary may award or withhold contracts independently of priorities. In fact, § 5 reflects no such intention. The Secretary's power to contract upon appropriate financial charges for water delivery, not included in the early bills, was added during the 1926 hearings in response to a request from Secretary of the Interior Work that users of water, as well as of power, be made to bear the cost of the project.[15] At the same time § 4 (b) for the first time provided that no work under the Act should begin until these revenues were assured by the Secretary's contracts. There was yet no provision prohibiting deliveries without contracts.[16]

Thus originally purely a financial tool, the contract power was later made to serve the additional purpose of enforcing the Compact's provisions against Arizona in the absence of her ratification. At the urging of the upper States § 8 had been amended to subject the United States in operating the dam to the Compact, to condition the enjoyment of the dam's benefits on compliance with the Compact, and to require that contracts from the United

---

[15] Hearings, *supra*, note 1, at 6, 46.

[16] H. R. 9826, 69th Cong., 1st Sess., § 5.

States should so provide.[17]   The upper States then insisted on inserting the requirement in § 5 that no one was to receive stored water without a contract, *expressly and solely for the purpose of tying the Compact's enforcement to the contract power.*[18]   There was no intent to confer absolute power to grant or withhold.   Indeed, to give effect to priorities in time of shortage, up to the maximum quantities permitted California by § 4 (a), tends to promote the stability of water uses, a policy Congress sought to further in § 5 itself by requiring that contracts be for permanent service.   In short, disregard of appropriations in one State in favor of those in another, except as required by the inter-basin apportionment of the Compact or by the California limitation, was no part of the purpose of this section; it was designed to insure revenue and to enforce the Compact and the California limitation.[19]

When the provision for water delivery contracts was first inserted in the Swing bill in 1926, it prescribed that "Contracts respecting water for domestic uses may be for permanent service but subject to rights of prior appropriators." [20]   Proponents of the bill later altered this

---

[17] S. 1868, 69th Cong., 1st Sess.; H. R. 6251, 69th Cong., 1st Sess.; H. R. 9826, 69th Cong., 1st Sess.   This amendment, wrote Secretary Work in recommending the bill, "provides for the distribution and use of all water for irrigation, power and otherwise, in accordance with the Colorado River compact."   Hearings, *supra,* note 1, at 8.

[18] See notes 1, 2, *supra,* and accompanying text.   Contracts were later made subject also to the California limitation in § 4 (a).

[19] It is significant to contrast the language giving the Secretary authority to enter water delivery contracts with that in § 5 (c), relating to the distribution of electrical power.   The latter provision explicitly gives the Secretary authority to resolve conflicts in applications, referring him for the governing standards to "the policy expressed in the Federal Water Power Act as to conflicting applications for permits and licenses."

[20] Hearings, *supra,* note 1, at 12.

provision to apply to irrigation contracts as well as to require, rather than simply to permit, that contracts be for permanent service.[21] At the request of the upper States, the phrase "subject to rights of prior appropriators" was deleted.[22] The Court concludes from this bit of history that Congress considered but rejected the suggestion that the law of appropriation govern the distribution of water stored in Lake Mead. But deletion or rejection of a proposed amendment is not strong evidence of legislative intention; the reasons for deletion may be any of a great number, not the least frequent of which is that the suggestion is redundant. Here it seems clear that there was a further reason for the change. The phrase was dropped at the same time the provision *requiring* each user to have a contract was added. Under the bill as it stood prior to this no contract was required, and new contracts were made junior to all prior appropriators, even those initiating or perfecting rights only after the statute became effective. As amended the bill required a contract of every user of stored waters, and the deleted clause was no longer in accord with the contractual plan. It is surely stretching things to suggest that deletion of this no longer accurate language signifies that the Secretary may award contracts on his own authority, without regard for priorities that would obtain under state law.

In support of its construction of § 5 the Court relies in large part upon an exchange between Senator Johnson and Senator Walsh of Montana. 70 Cong. Rec. 168. The only thing this colloquy seems to make clear is that Senator Johnson had not comprehensively analyzed the relationship between § 5 and the law of appropriation. First he thought the Secretary would be required to deliver water to those who had appropriated it; then he said this

---

[21] *Id.*, at 115.
[22] *Id.*, at 97, 115.

would be required "[i]f they contract"; then he agreed the
Secretary might withhold water "as he sees fit"; then he
"doubt[ed] very much" whether the Secretary could dis-
regard Los Angeles' appropriations; finally he said "pos-
sibly" the Secretary might utterly ignore appropriations.
This shifting dialogue can scarcely be deemed an authori-
tative, or even useful, aid to construction of the statute.

Nor is there warrant for the Court's reliance on the
statements of such opponents of the bill as Utah's Repre-
sentative Colton and Arizona's Representative Douglas.
Objections of opponents of a bill are seldom significant
guides to its construction. See *Schwegmann Bros. v.
Calvert Distillers Corp.*, 341 U. S. 384, 394–395. And in
any event in this instance the opponents themselves were
far from consistent in their views.[23]

Of far greater significance are the statements of the
bill's supporters, which confirm that no power to ignore
appropriations was given to the Secretary.[24] Represent-
ative Swing, author of the bill, responded to Mr. Hay-
den's assertion that such a power was given with an
emphatic denial: "the distribution will either be by agree-

---

[23] Thus, almost in the same breath with which Representative
Colton made his then seemingly dire prediction of national control,
he declared that "Arizona is not a party at all to this compact. She
and her citizens may appropriate water at any time." 69 Cong. Rec.
9648. Arizona, as has already been pointed out, was busily opposing
the bill on the specific ground that it left California free to appro-
priate from the river.

[24] The one apparent exception to the unanimity of view among
the bill's supporters is the statement in Representative Smith's report
of the third Swing bill to the House: "All rights respecting water or
power under the project are, under the terms of the bill, to be dis-
posed of by contract by the Government. It is not reasonable to
assume that the Government will do anything of an unfair or preju-
dicial nature to Arizona." H. R. Rep. No. 1657, 69th Cong., 2d
Sess. 11.

ment between the States or under their respective laws."
House Hearings, *supra,* note 1, at 32. The following year
he explained that the United States would not dispose of
water rights under the bill; it would merely store water
belonging to persons acquiring their rights under state
law. See pp. 604–605, *supra.* In 1928, defending the
House bill against an Arizona witness' charge that Califor-
nia might appropriate the entire Lower Basin supply, Mr.
Swing did not dispute the statement as to California's
rights but reinforced it by declaring that Arizona was
free to make appropriations too. Hearings before House
Committee on Irrigation and Reclamation on H. R. 5773,
70th Cong., 1st Sess. 57–58. He later assured the House
that notwithstanding the bill Arizona "still has the benefit
of the law of prior appropriation, and she still has the right
to the beneficial use of any of the water she is able to put
to use." 69 Cong. Rec. 9781. Delph Carpenter, pro-
ponent of the § 5 contract requirement, said that it was
designed to burden storage water with the Compact, and
thus to protect the Upper Basin, and that "[i]t has noth-
ing to do with the interstate relations between Arizona and
California." [25] Senator Johnson, sponsor of the Senate

---

[25] See note 1, *supra,* and accompanying text. Mr. Carpenter's re-
marks also included the following: " 'Except by contract made as
herein stated'. means this: If the flow of the Colorado River is con-
trolled and regulated by the construction of the Black Canyon Dam,
and any person in the State of Arizona attempt to take any water
out of the stream which has been discharged from the reservoir and
is being carried in the stream bed, as a natural conduit, for delivery
to lower users, this law would be brought into effect and he would
be prevented from using any of that water independent of the Colo-
rado River compact but unincumbered by any other condition for
the benefit of California and Nevada. In other words, the compact
does not disturb the rights between Arizona, California, and Nevada,
*inter sese,* as to their portion of the water." Hearings, *supra,* note
1, at 163.

bill, told the Senate the bill was made a part of the reclamation law, which "specifically protects each State in its water rights and in the rights of the citizens of those States to water." 68 Cong. Rec. 4292. Senator Pittman insisted there was nothing in the bill (prior to the California limitation) to prevent either Arizona or California from appropriating all the water she could use.[26] Senator Phipps, whose amendment became the California limitation, declared that any dispute over the relative rights of Arizona and of Los Angeles would be resolved by the Secretary in accordance with priority of appropriation and the normal preference for domestic over agricultural use.[27]

Of further weight in supporting the view that Congress did not construe § 5 to destroy the law of appropriation and apportionment is the fact that the entire controversy over the California limitation took place *after* § 5 was added to the bill. Utah was so certain that Arizona remained free to appropriate water despite § 5 that she

---

[26] "If a dam shall be built at Boulder Canyon it will impound certain waters and equate the flow below. The water below will be subject to appropriation and use by both California and Arizona . . . . In other words, there is nothing in this proposed legislation that could prevent Arizona from appropriating from the Colorado River within her borders all of the water she could use for irrigation." 68 Cong. Rec. 4412.

[27] "It seems to me that in resolving such a difficulty, should it arise, there would be taken into consideration the fact that water for domestic use should take priority over water intended for purposes of irrigation. Aside from that, these filings are first in point as compared with those to which the Senator from Arizona referred. They are for a superior use, and, in addition thereto, the applicant who has made the filing has pursued the proper course in developing the manner of appropriation or the manner of diverting the water and putting it to the highest beneficial use. I do not anticipate any difficulty on that score in resolving the question of priority by the Secretary of the Interior." 70 Cong. Rec. 169.

repealed her ratification of the six-state Compact there-after.[28]  While the original committee amendment to the Act would have required the Secretary to limit California's appropriations, the debates evidence no conviction that the Secretary had even a permissive authority to do so by virtue of the unamended § 5.

## IV.

### THE BEARING OF OTHER PROVISIONS OF THE PROJECT ACT.

Nothing in the Project Act expressly gives the Secretary power to ignore appropriations so long as financial conditions are met and the Compact and limitations are observed.   Senators Hayden and Pittman, as the Court notes, did indicate that § 4 (a) provided for an apportionment of the water, although even they did not suggest that § 4 (a) gave any authority to the Secretary to make an apportionment by his contracts or to allocate the burdens in time of shortage.   But in any event, as already noted, pp. 606–607, supra, § 4 does not by its terms make an apportionment; rather it simply requires six-state ratification of the Compact and an agreement by California to limit her share as conditions on the effectiveness of the Act, and authorizes an apportionment by the States themselves.   In the words of Senator Johnson, the provision

". . . does not divide the water between Arizona and California.   It fixes a maximum amount beyond which California can not go."   70 Cong. Rec. 385.

Nor does § 6, which requires that the dam be operated for the satisfaction of "present perfected rights" among

---

[28] See 68 Cong. Rec. 3064–3065; Hearings before House Committee on Irrigation and Reclamation on H. R. 5773, 70th Cong., 1st Sess. 191, 193, 214–215.

other purposes, indicate by negative implication that the Secretary may ignore all other appropriations. This provision was drafted by the Upper Basin States in order to insure that the condition of the Compact had been met to relieve them from the claims of perfected users below.[29] That condition was the construction of an adequate storage reservoir against which those claims could be asserted; the Compact has nothing to do with whether rights perfected under state law since 1929 may be ignored by the Secretary in awarding contracts. Section 8 (b), which subjects the United States and all users of the Project to any compact allocating among the Lower Basin States "the benefits, including power, arising from the use of water accruing to said States," and which subjects such an agreement, if made after January 1, 1929, to any delivery contracts made prior to its approval, is similarly no authority for the Court's conclusion. Legislative history is virtually silent as to the reason for giving such contracts precedence, but the provision seems simply to have been intended to promote the entering of contracts by insuring their permanence in accordance with the requirement of § 5.[30] There is no indication in § 8 (b) whether or not the Secretary is free in awarding contracts to ignore existing appropriations; it merely evidences a policy that rights so perfected as to have been reduced to a contract for delivery at a consideration, whatever the basis on which they should be awarded, ought not to be destroyed by a subsequent interstate agreement.

If the statute were completely silent as to whether the Secretary may disregard appropriations, the normal inference would be that Congress did not mean to displace

[29] See Hearings, *supra*, note 1, at 98, 116, 117.

[30] Delph Carpenter said that the Secretary's contracts should be lagged for only a limited period of time in order to give the States complete freedom to agree. *Id.*, at 204.

existing law. Enough has been said of the statute's history to buttress this inference beyond question. Moreover, the statute is by no means silent on this matter. The references in § 8 (a) and (b) to "appropriators" of water stored or delivered by the Project, and in § 4 (a) to the taking of steps "to initiate or perfect any claims to the use of water" made available by the dam, are only the least evidence.[31] Section 14 provides that the Reclamation Act shall govern the operation of Hoover Dam except as the Project Act otherwise provides. Section 8 of the Reclamation Act, 32 Stat. 390, 43 U. S. C. § 383, directs the Secretary of the Interior in carrying out his duties under the Act to proceed in accordance with state and territorial laws and declares that nothing in the federal act "shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof."

Both Representative Swing and Senator Johnson emphasized that this provision was deliberately incorporated into the Project Act to safeguard from federal destruction the rights of the States to their shares of the water.[32] This Court made clear in *Wyoming* v. *Colorado*, 259 U. S. 419, 463, that by thus protecting the rights of any State in an interstate stream Congress intended to leave untouched the law of interstate equitable apportionment. *Ivanhoe Irrig. Dist.* v. *McCracken*, 357 U. S. 275, 291, despite its dictum that § 8 applies only to the acquisition of rights by the United States and not to its operation of

---

[31] It should also be noted that, as the Master held, § 18, quoted *ante*, p. 585, clearly leaves each State free to apply its own law in determining rights among users within its borders. The Court's strained reading of this provision emasculates it entirely and sacrifices even matters of solely intrastate concern on the altar of federal supremacy.

[32] See pp. 604–605, 619–620, *supra*.

a dam, holds only that the clear command of § 5 of the Reclamation Act, 32 Stat. 389, 43 U. S. C. § 431—that water deliveries to each user not exceed the quantity required for 160 acres—prevails over state law, not that state law does not generally govern priorities in the use of water from federal reclamation projects under § 8.[33] The Court in *Ivanhoe* expressly stated that it was reaching its narrow conclusion:

> "[w]ithout passing generally on the coverage of § 8 in the delicate area of federal-state relations in the irrigation field . . . ." 357 U. S., at 292.

This general question, with reference to what is undoubtedly the most important single water project in the United States, is precisely the question before us today. In view of the language of the Project Act, as well as its background and legislative history, there can, I think, be no doubt of the answer.

## V.

### THE LACK OF STANDARDS DEFINING THE LIMITS OF THE SECRETARY'S POWER.

The Secretary, the Court holds, has already apportioned the waters of the mainstream by his contracts with Arizona and Nevada and has done so in accordance with the formula suggested as a basis for an interstate agreement in § 4 (a). This holding may come as a surprise to those

---

[33] Nor is anything said in *City of Fresno* v. *California,* 372 U. S. 627, relevant here, since the Court there stated only that if the Government exercises its power of eminent domain, "the effect of § 8 in such a case is to leave to state law the definition of the property interests, if any, for which compensation must be made." 372 U. S., at 630. *Fresno* did not consider the question now presented: the effect of § 8 in the *absence* of any exercise of the federal power of eminent domain.

responsible for a statement such as that in the Arizona contract, which provides that its terms are

". . . without prejudice to, any of the respective contentions of said states and water users as to . . . (5) what limitations on use, rights of use, and relative priorities exist as to the waters of the Colorado River system . . . ."

But whether the quantum of the Secretary's apportionment.was intentional or inadvertent, the Court holds that such an apportionment has been made, and the relevant question for the future is the one that is perhaps primarily responsible for this litigation: How is the burden of any shortage to be borne by the Lower Basin States? This question is not decided; the Court simply states that the initial determination is for the Secretary to make.

What yardsticks has Congress laid down for him to follow? There is, it is true, a duty imposed on the Secretary under § 6 to satisfy "present perfected rights," and if these rights are defined as those perfected on or before the effective date of the Act, it has been estimated that California's share amounts to approximately 3,000,000 acre-feet annually. This, then, would be the floor provided by the Act for California, assuming enough water is available to satisfy such present perfected rights. And the Act also has provided a ceiling for California: the 4,400,000 acre-feet of water (plus one-half of surplus) described in § 4 (a).

But what of that wide area between these two outer limits? Here, when we look for the standards defining the Secretary's authority, we find nothing.[34] Under the

---

[34] Nor, I submit, does the Court suggest any standards. Certainly, there is nothing in the enumeration of purposes in § 6 which will be of any assistance in helping the Secretary allocate the burden of shortages among competing irrigation and domestic uses within and among the Lower Basin States.

Court's construction of the Act, in other words, Congress has made a gift to the Secretary of almost 1,500,000 acre-feet of water a year, to allocate virtually as he pleases in the event of any shortage preventing the fulfillment of all of his delivery commitments.

The delegation of such unrestrained authority to an executive official raises, to say the least, the gravest constitutional doubts. See *Schechter Poultry Corp.* v. *United States*, 295 U. S. 495; *Panama Refining Co.* v. *Ryan*, 293 U. S. 388; cf. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 587–589. The principle that authority granted by the legislature must be limited by adequate standards serves two primary functions vital to preserving the separation of powers required by the Constitution.[35] *First,* it insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people. *Second,* it prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to judge the official action that has been challenged.

The absence of standards under the Court's construction is an instructive illustration of these points. The unrestrained power to determine the burden of shortages is the power to make a political decision of the highest order. Indeed, the political pressures that will doubtless be brought to bear on the Secretary as a result of this decision are disturbing to contemplate. Furthermore, whatever the Secretary decides to do, this Court will surely be unable effectively to review his actions, since it will not know what guides were intended by Congress to govern those actions.

These substantial constitutional doubts do not, of course, lead to the conclusion that the Project Act must

---

[35] See the discussion in Comment, 14 Stan. L. Rev. 372.

be held invalid. Rather, they buttress the conviction, already firmly grounded in the Act and its history, that no such authority was vested in the Secretary by Congress. Its purpose instead was to leave these matters to state law, and developed principles of equitable apportionment, subject only to the explicit exceptions provided in the Act.

For these reasons I respectfully dissent from the construction which the Court puts upon this aspect of the Act.

MR. JUSTICE DOUGLAS, dissenting.

## I.

This case, I think, has been haunted by several irrelevancies. First, is the fact that the only points from which California can take the water of the Colorado River System are on the mainstream above Laguna Dam, there being no tributaries in that State. This fact, I think, leads the Court to the inference that the tributaries which come in below Laguna Dam contain waters to which California has no rights. The controversy does concern the waters of the lower tributaries, but only indirectly. California does not seek those waters. She merely seeks to have them taken into consideration in the formula that determines the allocation between her and Arizona.

Another irrelevancy is the fact that only 2½% of the Colorado River drainage basin is in California, although 90% of the water which California appropriates leaves the basin never to return. If we were dealing with problems of equitable apportionment, as we were in *Nebraska* v. *Wyoming*, 325 U. S. 589, that factor would be relevant to our problem. And it would be relevant in case we were dealing with litigation concerning waters in excess of the amount granted California under the Project Act. But it is irrelevant here because the only justiciable

question that involves the volume of water is one that concerns the source of supply out of which California's 4,400,000 acre-feet will be satisfied—a matter which I think Congress resolved differently than has the Court.

Third, is a mood about the controversy that suggests that here, as in the cases involving multipurpose federal dams, federal control of navigable streams controls this litigation. The right of the Federal Government to the flow of the stream is not an issue here. We deal with a very unique feature of the irrigation laws of the 17 Western States.

The question is not what Congress has authority to do, but rather the kind of regime under which Congress has built this and other irrigation systems in the West. Heretofore those regimes have been posited on the theory that state law determines the allotment of waters coming through the irrigation canals that are fed by the federal dams.

Much is written these days about judicial lawmaking; and every scholar knows that judges who construe statutes must of necessity legislate interstitially, to paraphrase Mr. Justice Cardozo. Selected Writings (1947 Hall ed.), p. 160. The present case is different. It will, I think, be marked as the baldest attempt by judges in modern times to spin their own philosophy into the fabric of the law, in derogation of the will of the legislature. The present decision, as MR. JUSTICE HARLAN shows, grants the federal bureaucracy a power and command over water rights in the 17 Western States that it never has had, that it always wanted, that it could never persuade Congress to grant, and that this Court up to now has consistently refused to recognize. Our rulings heretofore have been consistent with the principles of reclamation law established by Congress both in nonnavigable streams (*Ickes* v. *Fox*, 300 U. S. 82, 94–96) and in navigable ones. *Nebraska* v. *Wyoming*, 325 U. S. 589, 612. The rights of the United

States as storer of waters in western projects have been distinctly understood to be simply that of "a carrier and distributor of the water." *Ickes* v. *Fox, supra,* p. 95. As we stated in *Nebraska* v. *Wyoming, supra,* p. 614:

> "The property right in the water right is separate and distinct from the property right in the reservoirs, ditches or canals. The water right is appurtenant to the land, the owner of which is the appropriator. The water right is acquired by perfecting an appropriation, i. e., by an actual diversion followed by an application within a reasonable time of the water to a beneficial use."

And that result was reached even though under those other projects, as under the present one, the Secretary had broad powers to make contracts governing the use and disposition of the stored water. See, *e. g.,* 43 U. S. C. §§ 389, 440.

The men who wrote the Project Act were familiar with western water law. *Wyoming* v. *Colorado,* 259 U. S. 419, had recently been decided, holding that priority of appropriation was the determining factor in reaching an equitable apportionment between two Western States. *Id.,* at 470. Yet, S. Rep. No. 654, 69th Cong., 1st Sess. 26–27, contains no suggestion that Congress, by § 5, was displacing a doctrine as important to these Western States as the doctrine of seizin has been to the development of Anglo-American property law. Instead, only 25 lines of that report are devoted to § 5, and those lines clearly support MR. JUSTICE HARLAN's conclusion that the section was designed primarily as a financial tool.

The principle that water priorities are governed by state law is deep-seated in western reclamation law. In spite of the express command of § 14 of the Project Act, which makes the system of appropriation under state law determine who has the priorities, the Secretary of the

Interior is given the right to determine the priorities by administrative. *fiat.* Now one can receive his priority because he is the most worthy Democrat or Republican, as the case may be.

The decision today, resulting in the confusion between the problem of priority of water rights and the public power problem, has made the dream of the federal bureaucracy come true by granting it, for the first time, the life-and-death power of dispensation of water rights long administered according to state law.

## II.

At issue on the other main phase of the case is the meaning of the California limitation contained in § 4 (a) of the Project Act. The Court, however,. does not use the present litigation as an occasion to determine Arizona's and California's rights under that Act, but as a vehicle for making a wholly new apportionment of the waters in the Lower Basin and turning over all unresolved problems to the Secretary of the Interior. The Court accomplishes this by distorting both the history and language of the Project Act.

The Court relies heavily on the terms and history of a proposed tri-state compact, authorized by § 4 (a) *but never adopted by the States concerned, viz., Arizona, California and Nevada.* The proposed tri-state compact provided for a division of tributary waters identical to that made by the Court, insofar as the Gila is awarded to Arizona. The Court in reality enforces its interpretation of the proposed tri-state compact and imposes *its terms* upon California.

The Court, however, cannot find in the proposed tri-state compact (the one that was never approved) an allocation of the tributaries other than the Gila; and in order to justify their allocation to Arizona it is forced to turn to the terms of "proposals and counterproposals over the

years," instead of to the language of the Project Act. The result is the Court's, not that of Congress, whose intent we have been called upon to discover and effectuate. The congressional intent is expressed in § 4 (a), which provides that California shall be limited to the use of 4,400,000 acre-feet "of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River compact" (the compact that was approved) and to not more than half of "any excess or surplus waters unapportioned by said compact." [1] These waters are defined in the Colorado River Compact as *system* waters, and not as waters in the mainstream. Yet the Court restricts California to *mainstream waters*. That is the essence of the difference between us.

## III.

As I read the Colorado River Compact and § 4 (a) of the Project Act, California is entitled to add all uses of system waters by Lower Basin States in the tributaries to those waters available in the mainstream to determine (1) how much water she can take out of the first 7,500,000 acre-feet apportioned to the Lower Basin States by Article III (a), and (2) whether there are excess or surplus system waters, including Article III (b) waters, of which California has a right to no more than one-half.

I disagree with the Court's conclusion that § 4 (a) of the Project Act refers only to the water flowing in the mainstream below Lee Ferry. The Project Act speaks clearly, and only, in terms of the waters apportioned to the Lower Basin States by Article III (a) of the Compact, *viz.*, California may take no more than 4,400,000 acre-feet "of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River

---

[1] The relevant provisions of the Project Act, the California Limitation Act, and the Colorado River Compact are set forth in the Appendix, *post,* p. 643.

compact." Article III (a) of the Compact apportions "from the Colorado River System in perpetuity to the Upper Basin and to the Lower Basin, respectively, the exclusive beneficial consumptive use of 7,500,000 acre-feet of water per annum." The term "Colorado River System" is defined in Article II (a) as including the entire mainstream and the tributaries.[2]

There is, moreover, not a word in Senate Report No. 592, 70th Cong., 1st Sess., reporting the Project Act, that indicates, suggests, or implies that the Colorado River is to be divided and California or any other Lower Basin State restricted to mainstream water. The Report indeed speaks of "enthroning the Colorado River compact" (id., p. 16), which embraces the entire river system in the United States, not just the mainstream. See Article II (a). Arizona's fears that California would take 5,400,000 acre-feet from the first 7,500,000 acre-feet, if the entire system were used as the source, are, I think, unfounded. Out of the first 7,500,000 acre-feet of system water, California would be entitled only to 4,400,000 acre-feet. Out of the balance or 3,100,000 acre-feet, California would be excluded.

How much of this 3,100,000 acre-feet should go to Arizona and how much to Nevada, New Mexico, and Utah cannot be determined on this record, the relevant findings not being made in light of the construction which has been given to the Project Act, the Compact, and the Limitation Act. We cannot take as a guide the provisions in the second paragraph of § 4 (a) of the Project Act, viz., the 300,000 acre-feet proposed for Nevada and the 2,800,000 acre-feet proposed for Arizona, because those provisions come into play only if Arizona, California, and Nevada enter a compact, which to date they have not done. The division of 3,100,000 acre-feet should, I think, be made

---

[2] See the Appendix, pp. 645–646, for the relevant portions of Article III.

among Arizona, Nevada, New Mexico, and Utah pursuant to the principles of equitable apportionment. *Nebraska v. Wyoming*, 325 U. S. 589.

The evidence is clear that the dependable Lower Basin supply does not exceed 8,000,000 acre-feet if the river system is taken as a whole. By Article III (b) of the Compact the Lower Basin States can increase their beneficial use by 1,000,000 acre-feet, *if additional water is available*. By § 4 (a) of the Project Act California is entitled to not more than one-half of any excess that is "unapportioned by said compact." The amount apportioned to the Lower Basin States by the Compact is 8,500,000 acre-feet, *viz.*, Article III (a) waters in the amount of 7,500,000 "in perpetuity" plus Article III (b) waters, which are highly contingent. After the Upper Basin is given its 7,500,000 acre-feet, the "unapportioned" excess described in Article III (b) would be available. As noted, the present permanent supply for the Lower Basin would not exceed 8,000,000 acre-feet from the mainstream and the tributaries. As I read the Compact and the Project Act, California would get out of the 8,000,000 acre-feet 4,400,000 acre-feet *plus* not more than one-half of Article III (b) waters, which, under the foregoing assumption, would amount to one-half of 500,000 acre-feet. If there is a further surplus (either in the sense of Article III (b) or in the more remote sense in which § 4 (a) of the Project Act uses that word),[3] the division between the Lower Basin

---

[3] It is said that the § 4 (a) language referring to surplus or excess waters, one-half of which is to go to California, the other to Arizona, is meaningless if read literally. That turns on the meaning of the words "excess or surplus waters unapportioned" by the Compact. They mean, it is said, all waters unapportioned by Article III (a) and (b), because Article III (c) defines or speaks of surplus in such manner as to indicate that surplus is only that water over and above Article III (a) and (b) water. This is true, at least for the limited purpose of Article III (c). From that premise it is reasoned that § 4 (a), literally construed, would allow Arizona and California to split equally all waters over 16,000,000 acre-feet,

States should follow the principles of equitable apportionment which we applied in *Nebraska* v. *Wyoming*, 325 U. S. 589. If § 4 (a) is to be read as referring to system waters, California's total rights in available Lower Basin waters would amount to not more than 4,650,000 acre-feet annually (4,400,000 plus 250,000). She would also have a right, albeit highly contingent, to any additional Article III (b) waters that become available to the Lower Basin and to such share of the waters in both Basins over 16,000,000 acre-feet (7,500,000 to Upper Basin, 7,500,000 to Lower Basin under Article III (a), plus 1,000,000 to Lower Basin under Article III (b)) as is equitable. *Nebraska* v. *Wyoming, supra.*

Under the Court's reading of § 4 (a), however, a far different division is made. The Court says that the

---

that is after 7,500,000 acre-feet went to each of the Basins, and after the Lower Basin received an additional 1,000,000 acre-feet under the provisions of Article III (b). If that is true and if California and Arizona were allowed to divide up the rest, the Upper Basin States would forever be limited to their initial 7,500,000 acre-feet, something not contemplated by Article III (f), which specifically provides for apportionment of waters in excess of 16,000,000 between the Upper and Lower Basins. Thus, it is argued that the words "excess or surplus waters" as used in § 4 (a) are meaningless and in hopeless conflict with the terms of the Compact if read literally.

This interpretation is ill-founded. The first paragraph of § 4 (a) contains only a limitation; it apportions no water. The tri-state compact authorized by the second paragraph of § 4 (a) has never been made. But, even if it had been made, it could affect only the rights of its signatories *vis-à-vis* each other. For § 4 (a) explicitly provides "that all of the provisions of said tri-State agreement shall be subject in all particulars to the provisions of the Colorado River compact."

The words "excess or surplus waters unapportioned by said compact" mean, I think, Article III (b) waters plus all waters in the entire System in excess of 16,000,000 acre-feet. Not only does this interpretation allow the Project Act and the Colorado River Compact to be construed as a harmonious whole, but it is also compelled by the legislative history. See 70 Cong. Rec. 459–460.

language of § 4 (a) limiting California to 4,400,000 acre-feet "of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River compact" (7,500,000 acre-feet per annum) is just a "shorthand" way of saying that California is limited to 4,400,000 acre-feet of the water available in the mainstream. According to the Court, California has no rights in system waters, as this would include rights in the tributaries, and the Court has decided that the tributaries belong exclusively to Arizona. Thus, if California is to obtain any "excess or surplus" waters, the surplus must be flowing in the mainstream. That is, California can assert her right to "surplus" waters only when the flow of the mainstream is more than 7,500,000 acre-feet per year. But if, as the evidence shows, the dependable Lower Basin supply of *system* waters is only 8,000,000 acre-feet per annum, 2,000,000 of which are in the tributaries, California can look only to 6,000,000 acre-feet in the mainstream. Thus, California will never be entitled to any of the additional Article III (b) waters (500,000 acre-feet) in the Lower Basin system. Those "surplus" waters would necessarily be in the tributaries, and under the Court's interpretation they belong exclusively to Arizona, § 4 (a) to the contrary notwithstanding.

As a practical matter, the only place California can get system waters is from the mainstream, there being no tributaries of the Colorado River in California. The question to be decided is whether or not under § 4 (a) of the Project Act California can take into consideration Arizona's uses on her tributaries in determining her (California's) right to divert water from the mainstream. The Court says California cannot, because when the Project Act refers to her rights in *system* waters as the measuring rod, it really means her rights in mainstream waters. With due respect, the majority achieves that result by misreading the Colorado River Compact, the

Project Act, and by misreading the legislative history leading up to the California Limitation Act. An analysis of the legislative history will show, as already noted, that the Court's analysis is built mainly upon statements made by the various Senators in arguing the terms of a proposed tri-state compact that was never made.

## IV.

The Project Act needs the Compact to achieve a settlement of the issue of the apportionment of water involved in this case. It is argued that an apportionment, constitutionally, can be achieved only in one of two ways— by an interstate compact or by a decree of equitable apportionment. That proposition need not, however, be resolved here, because (apart from a contingency not relevant here) the Project Act by the express terms of § 4 (a) is dependent on the ratification of the Compact.[4] If the Compact is ratified, it and the Project Act are to supply the measure of waters which California may claim.[5]

---

[4] Under § 4 (a) of the Project Act it is provided that if all seven States fail to ratify the Compact in six months (which in fact they did fail to do), the Project Act shall not take effect until six of the States, including California, ratify the Compact and waive the provisions of Article XI of the Compact (which required approval of all seven States) and the President has so declared by public proclamation. A further condition was the passage of California's Limitation Act. The Presidential Proclamation is dated June 25, 1929. 46 Stat. 3000; and California's Limitation Act was approved March 4, 1929, and. became effective August 14, 1929.

[5] The Colorado River Compact is referred to many times in the Project Act—§ 1, § 4 (a), § 6, § 8, § 12, § 13, § 18, and § 19.

By § 18 the rights of the States to waters within their borders are not interfered with "except as modified by the Colorado River compact or other interstate agreement."

By § 8 (a) "all users and appropriators" of water are "subject to and controlled by said Colorado River compact . . . anything in this Act to the contrary notwithstanding . . . ."

The overall accounting of the waters is provided for in Article III of the Compact. By Article III (a) "the exclusive beneficial consumptive use of 7,500,000 acre-feet of water per annum" is apportioned "in perpetuity to the Upper Basin and to the Lower Basin, respectively," meaning that each basin gets 7,500,000 acre-feet. By Article III (b) the Lower Basin is given the right to increase its beneficial consumptive use by 1,000,000 acre-feet per annum. By Article III (c) any deficiency owed Mexico "shall be equally borne by the Upper Basin and the Lower Basin." The Lower Basin by definition includes California. Article II (g). Tributary uses in Arizona diminish California's right under Article III (c) to require the Upper Basin States to supply water to satisfy Mexico. California is to be charged with water from the Gila when the accounting is made with Mexico. That is, California is presumed to enjoy the waters from the Lower Basin tributaries for purposes of Article III (c) of the Compact. It is manifestly unfair to charge her with those waters under Article III (c) of the Compact and to say that she is entitled to none of them in computing the 4,400,000 acre-feet which the Limitation Act and the Project Act give her out of the waters of Article III (a) of the Compact.

Section 1 of the Project Act authorizes the Secretary of the Interior to construct and operate the Boulder Dam "subject to the terms of the Colorado River *compact*." By § 4 (a) the Project Act is not to be operative unless and until the seven States "shall have ratified the Colorado River *compact*"; and if they do not, then "the provisions of the first paragraph of Article XI of said *compact*" must be waived. Moreover, the 4,400,000 acre-feet allotted to California by § 4 (a) are described in terms "of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River *compact*." Section 4 (a) describes the "excess or surplus" waters in

terms of those "unapportioned by said *compact*"; and it makes all "uses always to be subject to the terms of said *compact*." The *compact* is, indeed, the underpinning of the Project Act.

The Compact apportions the waters "from the Colorado River System," which by definition includes the mainstream and its tributaries in the United States. And California's Limitation Act, containing the precise language of the allocation of waters in § 4 (a) of the Project Act, describes the 4,400,000 acre-feet in terms "of the waters apportioned to the lower basin states by paragraph 'a' of article three of the said Colorado river *compact*." [6]

So it seems that the Compact is the mainspring from which all rights flow. The 7,500,000 acre-feet of water apportioned by Article III (a) of the Compact "from the Colorado River System" to the Lower Basin is the supply out of which California's 4,400,000 acre-feet is to be taken.

To repeat, the words "excess or surplus waters unapportioned by said compact," as used in § 4 (a) of the Project Act, mean, in my view, all waters available in the Lower Basin in excess of the first 7,500,000 acre-feet covered by Article III (a) of the Compact. [7]

The additional 1,000,000 acre-feet described in Article III (b) was added to the Compact "to compensate for the

---

[6] It was indicated in *Arizona* v. *California*, 292 U. S. 341, 357, that the Limitation Act incorporates the Compact:

"it may be true that the Boulder Canyon Project Act leaves in doubt the apportionment among the states of the lower basin of the waters to which the lower basin is entitled under Article III (b). But the Act does not purport to apportion among the states of the lower basin the waters to which the lower basin is entitled under the Compact. The Act merely places limits on California's use of waters under Article III (a) and of surplus waters; and it is 'such' uses which are 'subject to the terms of said compact.'"

[7] See note 3, *supra*.

waters of the Gila River and its tributaries being included within the definition of the Colorado River System." *Arizona* v. *California,* 292 U. S. 341, 350–351. And though Arizona has long claimed those 1,000,000 acre-feet as hers, that construction of Article III (b) of the Compact was rejected long ago. *Arizona* v. *California, supra,* p. 358.

## V.

. While the legislative history of the California limitation contained in § 4 (a) looks several ways, much of it is legislative history made with a view to its favorable use in the future—a situation we have noticed on other occasions. See *Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384. I think an objective reading of that history shows that the tri-state compact authorized by § 4 (a) of the Project Act (a compact never made) was *the one and only way* visualized by that Act through which Arizona could get the *exclusive use* of the waters of the Gila River. For the second paragraph of § 4 (a) of the Project Act states that the tri-state compact, *if made,* shall give Arizona "the exclusive beneficial consumptive use of the Gila River and its tributaries" within the boundaries of Arizona. Fears that this appropriation would injure New Mexico are not relevant to our problem, since the proposed tri-state compact would not hurt New Mexico unless she agreed to it. The legal rights of States not parties to the Compact would be unimpaired, as *Arizona* v. *California,* 283 U. S. 423, 462, holds. The same applies to any concern that Upper Basin rights would be imperiled by the tri-state compact.

After much discussion, the amendment allocating 4,400,000 acre-feet to California by § 4 (a) of the Project Act was finalized by Senator Phipps, Chairman of the Committee on Irrigation and Reclamation, who identified

those 4,400,000 acre-feet as system waters. He made it unmistakably clear by adding to § 4 (a) the words "by paragraph (a) of Article III" of the Compact which in his words "show that that allocation of water refers directly to the seven and one-half million acre-feet of water" described by Article III (a) of the Compact. 70 Cong. Rec. 459. That amendment was agreed to without a roll call. 70 Cong. Rec. 473. Prior to that time Senator Phipps had proposed that California receive 4,600,000 acre-feet. *Id.*, p. 335.

The following colloquy took place:

"Mr. HAYDEN. Under the circumstances I should like to inquire of the Senator from Colorado how he arrives at the figure 4,600,000 acre-feet of water instead of 4,200,000 acre-feet as proposed in my amendment?

"Mr. PHIPPS. It was just about as difficult for me to arrive at 4,600,000 acre-feet as it would have been to arrive at 4,200,000 acre-feet. The arguments pro and con have been debated in the committee for quite a period of time. The contentions made by the Senators from Arizona have not been conclusive to my mind. For instance, I will refer to the fact that *Arizona desires to eliminate entirely all waters arising in the watershed and flowing out of the Gila River.*

"Mr. HAYDEN. There is nothing of that kind in the Senator's amendment.

"Mr. PHIPPS. There is nothing of that kind in the Senator's amendment, but that has been one of the arguments advanced by California as being an offset to the amount to which Arizona would try to limit California.

"Mr. HAYDEN. If the Senator thought there was force in that argument, I should think that he

would have included in his amendment a provision eliminating the waters of the Gila River and its tributaries, as my amendment does.

"Mr. PHIPPS. I do not consider it necessary. because the bill itself, not only the present substitute measure but every other bill on the subject, *ties this question up with the Colorado River compact.*

"Mr. HAYDEN. My amendment does that.

"Mr. PHIPPS. Yes; that is true, but under estimates of engineers—one I happen to recall being made, I think, by Mr. La Rue—notwithstanding all of the purposes to which water of the Gila may be put by the State of Arizona, at least 1,000,000 acrefeet will return to the main stream. Yet Arizona contends that that water is not available to California; whereas to-day and for years past at least some of the waters from the Gila River have come into the canal which is now supplying the Imperial Valley.

"It is not a definite fixed fact that with the enactment of this proposed legislation the all-American canal is going to be built within the period of seven years; as a matter of fact, it may not be built at all; we do not know as to that. *But I do not think that the water from the Gila River, one of the main tributaries of the Colorado, should be eliminated from consideration. I think that California is entitled to have that counted in as being a part of the basic supply of water.*" (Italics added.)

It is plain from this colloquy that Senator Phipps thought that his amendment, limiting the amount California can claim, "ties this question up with the Colorado River compact" and that the Gila River (below Lake Mead) should be "counted in as being a part of the

basic supply of water" which California is entitled to have included in the computations for the Lower Basin States.

The word of Senator Phipps, who was chairman of the committee and who offered the amendment, is to be taken as against those in opposition or those who might be making legislative history to serve their ends. *Schwegmann Bros.* v. *Calvert Corp., supra,* pp. 394–395: "The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt."

If California were restricted by the Project Act to the use of 4,400,000 acre-feet out of the mainstream, it is difficult to believe that Senator Ashurst of Arizona would have expressed his bitter minority views in the Report on the Project Act. S. Rep. No. 592, 70th Cong., 1st Sess., pt. 2. He said that the bill "sedulously and intentionally proposes to sever Arizona's jugular vein" (*id.,* p. 3), that "the amount of water apportioned to California . . . is not warranted in equity, law, justice, or morals" (*id.,* p. 4), that the bill is "a reckless and relentless assault upon Arizona." *Id.,* p. 38. He apparently never imagined that the proposed legislation would confine California to mainstream water. He indeed charged that the bill "authorizes California, which comprises only 2½ per cent of the Colorado River Basin and contributes no water, to appropriate . . . over 38 per cent of the estimated constant water supply available in the main Colorado River for all seven States in the basin and for Mexico." *Id.,* p. 5.

Like Senator Ashurst and like the Chairman of the Senate Committee, Senator Phipps, I too read the Project Act to speak in terms of the entire Colorado River System in the United States.

## APPENDIX TO OPINION OF
## MR. JUSTICE DOUGLAS.

Section 4 (a) of the Project Act provides in relevant part:

"This Act shall not take effect and no authority shall be exercised hereunder and no work shall be begun and no moneys expended on or in connection with the works or structures provided for in this Act, and no water rights shall be claimed or initiated hereunder, and no steps shall be taken by the United States or by others to initiate or perfect any claims to the use of water pertinent to such works or structures unless and until (1) the States of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming shall have ratified the Colorado River compact, mentioned in section 13 hereof, and the President by public proclamation shall have so declared, or (2) if said States fail to ratify the said compact within six months from the date of the passage of this Act then, until six of said States, including the State of California, shall ratify said compact and shall consent to waive the provisions of the first paragraph of Article XI of said compact, which makes the same binding and obligatory only when approved by each of the seven States signatory thereto, and shall have approved said compact without conditions, save that of such six-State approval, and the President by public proclamation shall have so declared, and, further, until the State of California, by act of its legislature, shall agree irrevocably and unconditionally with the United States and for the benefit of the States of Arizona, Colorado, Nevada, New Mexico, Utah, and Wyoming, as an express covenant and in consideration of the passage of this Act, that the aggregate annual consumptive use (diversions less returns to the river) of water of and from

the Colorado River for use in the State of California, including all uses under contracts made under the provisions of this Act and all water necessary for the supply of any rights which may now exist, shall not exceed four million four hundred thousand acre-feet of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River compact, plus not more than one-half of any excess or surplus waters unapportioned by said compact, such uses always to be subject to the terms of said compact.

"The States of Arizona, California, and Nevada are authorized to enter into an agreement which shall provide (1) that of the 7,500,000 acre-feet annually apportioned to the lower basin by paragraph (a) of Article III of the Colorado River compact, there shall be apportioned to the State of Nevada 300,000 acre-feet and to the State of Arizona 2,800,000 acre-feet for exclusive beneficial consumptive use in perpetuity, and (2) that the State of Arizona may annually use one-half of the excess or surplus waters unapportioned by the Colorado River compact, and (3) that the State of Arizona shall have the exclusive beneficial consumptive use of the Gila River and its tributaries within the boundaries of said State, and (4) that the waters of the Gila River and its tributaries, except return flow after the same enters the Colorado River, shall never be subject to any diminution whatever by any allowance of water which may be made by treaty or otherwise to the United States of Mexico but if, as provided in paragraph (c) of Article III of the Colorado River compact, it shall become necessary to supply water to the United States of Mexico from waters over and above the quantities which are surplus as defined by said compact, then the State of California shall and will mutually agree with the State of Arizona to supply, out of the main stream of the Colorado River, one-half of any deficiency which must be supplied to Mexico by the lower basin,

and . . . (6) that all of the provisions of said tri-State agreement shall be subject in all particulars to the provisions of the Colorado River compact . . . ."

By §·1 of the California Limitation Act it was provided that when the seven States approved the Compact and its approval is proclaimed by the President that:

". . . the State of California as of the date of such proclamation agrees irrevocably and unconditionally with the United States and for the benefit of the states of Arizona, Colorado, Nevada, New Mexico, Utah and Wyoming as an express covenant and in consideration of the passage of the said 'Boulder canyon project act' that the aggregate annual consumptive use (diversions less returns to the river) of water of and from the Colorado river for use in the State of California including all uses under contracts made under the provisions of said 'Boulder canyon project act,' and all water necessary for the supply of any rights which may now exist, shall not exceed four million four hundred thousand acre-feet of the waters apportioned to the lower basin states by paragraph 'a' of article three of the said Colorado river compact, plus not more than one-half of any excess or surplus waters unapportioned by said compact, such uses always to be subject to the terms of said compact."

Article III of the Compact provides in relevant part:

"(a) There is hereby apportioned from the Colorado River System in perpetuity to the Upper Basin and to the Lower Basin, respectively, the exclusive beneficial consumptive use of 7,500,000 acre-feet·of water per annum, which shall include all water necessary for the supply of any rights which may now exist.

"(b) In addition to the apportionment in paragraph (a), the Lower Basin is hereby given the right to increase its beneficial consumptive use of such waters by one million acre-feet per annum.

"(c) If, as a matter of international comity, the United States of America shall hereafter recognize in the United States of Mexico any right to the use of any waters of the Colorado River System, such waters shall be supplied first from the waters which are surplus over and above the aggregate of the quantities specified in paragraphs (a) and (b); and if such surplus shall prove insufficient for this purpose, then, the burden of such deficiency shall be equally borne by the Upper Basin and the Lower Basin, and whenever necessary the States of the Upper Division shall deliver at Lee Ferry water to supply one-half of the deficiency so recognized in addition to that provided in paragraph (d).

"(d) The States of the Upper Division will not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75,000,000 acre-feet for any period of ten consecutive years reckoned in continuing progressive series beginning with the first day of October next succeeding the ratification of this compact."